| | | |
|---|---|---|
| LEON STUART, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 18-cv-11877-ADB |
| CITY OF GLOUCESTER, CHIEF JOHN MCCARTHY, and LIEUTENANT JEREMIAH NICASTRO, in their Official and Individual Capacities, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DIMISS

BURROUGHS, D.J.

In this civil rights action, Plaintiff Leon Stuart ("Officer Stuart"), a former Gloucester police officer and former president of the Gloucester Police Department ("GPD") union, brings claims against the City of Gloucester, John McCarthy ("Chief McCarthy"), Chief of the GPD, and a former colleague, Lieutenant Jeremiah Nicastro ("Lt. Nicastro") following the termination of his employment.[1] Officer Stuart alleges that Chief McCarthy and Lt. Nicastro (together, "Defendants") (1) violated his "right to free speech, right to participate in concerted union activity, right to Procedural and Substantive Due Process, right to continued employment and the right to petition and seek redress from Governmental abuse without retaliation" in contravention of 42 U.S.C. § 1983 ("Section 1983"); (2) violated his "right to free speech, protected right to participate in union activity, right of continued employment and Due Process of law" in violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws. ch. 12, §§ 11H, 11I; and,

---

[1] The City of Gloucester answered the Complaint on November 19, 2018 and has not sought dismissal of the claims against it. [ECF No. 11].

(3) intentionally inflicted emotional distress.[2]  [ECF No. 1 ("Complaint" or "Compl.") ¶¶ 103, 112–19].  Currently pending before the Court are Defendants' motions to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  [ECF Nos. 13, 15].  For the reasons set forth below, Chief McCarthy's motion to dismiss [ECF No. 12] is <u>GRANTED</u> in part and <u>DENIED</u> in part and Lt. Nicastro's motion to dismiss [ECF No. 14] is <u>GRANTED</u>.

## I.    BACKGROUND

The following facts are drawn from the Complaint, the well-pleaded allegations of which are taken as true for the purposes of evaluating the motion to dismiss.  See <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).  The Court also considers documents attached to the Complaint, which are incorporated by reference into the Complaint.  See <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

<u>Union Activity</u>

In 2016, Officer Stuart became the local union president for the GPD and represented a bargaining unit of 45 employees.  [Compl. ¶ 9].  For the preceding nine years, he had held other leadership roles in the union.  [<u>Id.</u>].

On May 11, 2017, Officer Stuart met with Donna Leete, the Director of Human Resources for the City of Gloucester ("Director Leete"), in his capacity as union president.  [<u>Id.</u> ¶ 19].  Officer Stuart sought the meeting with Director Leete to discuss concerns about inappropriate behavior he had witnessed at a wake for a former colleague on May 2, 2017 and to ensure that the City of Gloucester would take appropriate disciplinary action.  See [<u>id.</u> ¶¶ 12–19].  During the meeting, both Director Leete and Officer Stuart heard Lieutenant David Quinn ("Lt.

---

[2] Officer Stuart also alleges that the City of Gloucester retaliated against him in violation of the Commonwealth's whistleblower statute, Mass. Gen. Laws ch. 149, § 185(b)(1), (3).  [ECF No. 1 ¶ 108].

Quinn"), who had been involved in the incident at the wake, and Lt. Nicastro eavesdropping outside the door to Director Leete's office. [Id. ¶ 20]. When Director Leete opened the door, both Lt. Nicastro and Lt. Quinn quickly left the area. [Id.].

Following the meeting, union counsel sent a letter to Director Leete expressing concern that Lt. Quinn and Lt. Nicastro's behavior was intended to intimidate Officer Stuart and other union members and to interfere with union activity. [Id. ¶ 21; ECF No. 1-1]. Union counsel requested that the City of Gloucester investigate the incident. [Compl. ¶ 21].

On June 29, 2017, Chief McCarthy notified Officer Stuart that he was under investigation after "formal complaints from two ranking officers of this department" had been lodged concerning the events of May 11, 2017. [Id. ¶ 22; ECF No. 1-2]. The notice indicated that Chief McCarthy was also investigating "the dissemination of these false accusations to all patrolmen in this department and to the Gloucester Daily Times Reporter Ray Lamont." [ECF No. 1-2]. The notice ordered Officer Stuart to respond to a series of questions and stated that the investigation "could result in disciplinary action against you." [Compl. ¶¶ 23–24; ECF No. 1-2]. Officer Stuart responded to Chief McCarthy's questions on July 13, 2017. [Compl. ¶ 26; ECF No. 1-3]. Officer Stuart also filed a complaint against Chief McCarthy and the City of Gloucester with the Department of Labor Relations. [Compl. ¶ 25].

Officer Stuart experienced emotional distress as a result of the threat of discipline and the potential for the loss of employment. [Id. ¶ 27]. At some time after June 29, 2017, Officer Stuart was placed on Injured on Duty ("IOD") leave "as a result of the significant stress he was experiencing at work." [Id.]. Officer Stuart was cleared by his physician to return to work on July 20, 2017. [Id. ¶ 28]. Chief McCarthy and the City of Gloucester denied Officer Stuart's return to work without further documentation. [Id. ¶ 29]. On July 20, 2017, union counsel

emailed Chief McCarthy and Director Leete regarding the department's refusal to allow Officer Stuart to return to work and stated that doing so in close temporal proximity to the filing of a Department of Labor complaint "raises the specter of retaliation." [Id. ¶¶ 30–31; ECF No. 1-4]. It is not clear when Officer Stuart was permitted to return to work and under what circumstances.

On September 28, 2017, Officer Stuart wrote to Gloucester Mayor Romeo Theken to voice the union's concerns with an ongoing audit process at the GPD. [Compl. ¶ 32; ECF No. 1-5].

Whistleblowing Activity

On December 12, 2017, Officer Stuart filed a written report with Chief McCarthy concerning improper orders he had received from his immediate supervisors, Sergeant Christopher Frates ("Sgt. Frates") and Lt. Nicastro, on November 30 and December 1, 2017. [Compl. ¶ 34; ECF No. 1-6]. On November 30, 2017, Officer Stuart was dispatched in response to a call reporting an unwelcome guest at a residence. [Compl. ¶ 35]. The female caller explained to Officer Stuart that she wanted the unwelcome male guest to leave but she did not provide enough information to support criminal charges or seem willing to press charges. [Id. ¶¶ 36–37]. Officer Stuart called a cab to remove the unwelcome guest. [Id. ¶¶ 37–38]. Sgt. Frates arrived at the scene before the cab arrived and ordered Officer Stuart to arrest the unwelcome guest. [Id. ¶ 38]. Officer Stuart complied and arrested the unwelcome guest for disorderly conduct. [Id. ¶ 39]. The next day, December 1, 2017, Lt. Nicastro told Officer Stuart to change the arrest report from the night before to state that Officer Stuart was unable to complete his interview of the arrested person, which would allow additional changes to be made to the report. [Id. ¶¶ 40–41]. Officer Stuart's report to Chief McCarthy on December 12, 2017

stated that he believed that it was wrong to make the November 30, 2017 arrest.  [Id. ¶ 43; ECF No. 1-6].

Officer Stuart also formally complained to Chief McCarthy about another arrest report that was changed by Lt. Nicastro around December 2, 2017, which resulted in an investigation of Lt. Nicastro's conduct.  See [Compl. ¶¶ 45–55].  On December 2, 2017, Officer Stuart, Officer Christopher Liacos ("Officer Liacos"), Sergeant Jerome Ciolino, and Lt. Nicastro responded to a complaint of an alleged assault.  [Id. ¶ 46].  Officers Stuart and Liacos interviewed the caller and his wife, Mr. and Mrs. L., who alleged that they woke up to the blankets being pulled off them and their seven-year old daughter by Mr. M., who lived with them.  [Id. ¶¶ 47–48].  Mrs. L. stated that "she noticed her daughter's nightgown was pulled up, but she had not actually seen Mr. M. move her daughter's nightgown or touch any portion of her daughter's body."  [Id. ¶ 49].

After reviewing case law and learning that ". . . rubbing of the abdomen is considered indecent assault and battery," Lt. Nicastro changed Officer Liacos's report to state that Mr. M. had touched the daughter's abdomen while pushing up her nightgown.  [Id. ¶¶ 50–51].  Mr. M. was thereafter charged with indecent assault and battery on a child under fourteen.  [Id. ¶ 53].

Following Officer Stuart's report to Chief McCarthy of Lt. Nicastro's actions, the City of Gloucester hired Alfred Donovan ("Mr. Donovan") to conduct an independent investigation.  [Id. ¶¶ 54–55].  Officer Stuart was interviewed as part of this investigation, but his testimony was not included in the final report, which was issued in February 2018.  [Id. ¶¶ 55–56; ECF No. 1-7]. Lt. Nicastro admitted to "amending" the arresting officer's report and changing the charge from domestic assault and battery to indecent assault and battery.  [Compl. ¶ 57].

On December 28, 2017, Officer Stuart was involved in an altercation with an individual named Shawn Bartholomew ("Mr. Bartholomew") while off-duty. [Id. ¶¶ 58–62]. Officer Stuart observed Mr. Bartholomew run a stop sign and travel at 40mph in a 25mph zone. [Id. ¶¶ 59–60]. Officer Stuart directed the driver of the car he was in to follow Mr. Bartholomew's vehicle, and once stopped, identified himself to Mr. Bartholomew as a GPD officer. [Id. ¶ 62]. Officer Stuart told Mr. Bartholomew that he would be issued a citation and instructed Mr. Bartholomew to return to his vehicle to wait for a GPD marked car to arrive, as Officer Stuart did not have a citation book on him. [Id. ¶¶ 62–63].

When told that a GPD marked car was en route, Mr. Bartholomew "suddenly moved toward" Officer Stuart and a physical struggle between the two men ensued. [Id. ¶ 66]. When the GPD marked car arrived, Mr. Bartholomew was arrested, taken into custody, and issued a citation. [Id. ¶¶ 67–68]. Officer Stuart's shoulder was injured in the altercation, and he was placed on IOD. [Id. ¶ 69]. The altercation between Officer Stuart and Mr. Bartholomew was captured on video. [Id. ¶ 76].

On February 21, 2018, Chief McCarthy notified Officer Stuart in writing that his actions on December 28, 2017 were being investigated by the GPD. [Id. ¶¶ 70–71; ECF No. 1-8]. Mr. Donovan was again hired to conduct this investigation. [Compl. ¶¶ 55, 72]. According to the Complaint, Mr. Donovan did not have the licenses needed to conduct either this investigation or the earlier investigation into Lt. Nicastro. [Id. ¶ 73].

On February 28, 2018, Officer Stuart was interviewed by Mr. Donovan. [Id. ¶ 78]. Despite multiple requests, Officer Stuart and his counsel did not receive a copy of the video of the December 28, 2017 incident in advance of, or during, the interview. [Id. ¶¶ 76–78]. Officer

Stuart and his counsel also sought to learn who initiated the complaint against Officer Stuart and voiced to the City of Gloucester their concern about the timing of the investigation and a possible connection to Officer Stuart's union activity.  [Id. ¶¶ 81–83].

On March 28, 2018, Officer Stuart filed a "criminal complaint form" with the Office of the Attorney General that named Mr. Donovan and Lt. Nicastro as the subjects of the complaint. [Id. ¶ 84; ECF No. 1-10].  On April 16, 2018, Officer Stuart emailed State Police Trooper Baker, who worked in the Office of the Attorney General, and stated that he believed that he was being retaliated against for reporting incidents involving other GPD officers.  [Compl. ¶ 86].

On April 13, 2018, Officer Stuart was notified that his disciplinary hearing would be held on April 18, 2018.  [Id. ¶ 85].  Before April 18, Officer Stuart received Mr. Donovan's report, which Officer Stuart believed to be incomplete because it did not contain an audio tape or transcript of several witness interviews, including the interview of Mr. Bartholomew.  [Id. ¶ 87].

On May 8, 2018, Officer Stuart notified the City of Gloucester, Chief McCarthy, and Mayor Theken that he intended to pursue an action under the Massachusetts Whistleblower Protection Act and under state and federal civil rights laws for "retaliation for objecting to and refusing to engage in activities protected by state law and for reporting and/or objecting to matters that he reasonably believed to be violations of law or threats to public safety."  [Id. ¶ 88; ECF No. 1-12].  The notice stated that Officer Stuart "has been subjected to repeated threats, intimidation, and coercion by multiple members" of the GPD.  [Compl. ¶ 89].

On May 15, 2018, the City of Gloucester conducted a disciplinary hearing regarding Officer Stuart's actions on December 28, 2017.  [Id. ¶ 90].  At the hearing, Chief McCarthy testified that Mr. Batholomew had not made a complaint against Officer Stuart and that it was

Chief McCarthy who decided to look into the incident after he was contacted by a reporter from the Gloucester Daily Times. [Id. ¶¶ 91–93].

On June 19, 2018, Officer Stuart was notified that he was being terminated from his position at the GPD, effective immediately. [Id. ¶ 97]. The termination notice stated that Officer Stuart was being terminated "[b]ased upon the above findings of several policy violations, including the use of unnecessary and unreasonable force and the inaccurate reporting of the facts of a physical altercation he initiated on December 28, 2017 . . . ." [Id.]. The next day, Chief McCarthy posted a notice on the "Roll Call Board" of the GPD, which informed GPD employees of Officer Stuart's termination and stated that any "police interaction" with Officer Stuart needed to be vetted by Chief McCarthy or Lieutenant Fitzgerald. [Id. ¶ 98]. Similar notices had not been posted when other GPD officers were terminated. [Id. ¶ 99].

On August 31, 2018, Officer Stuart filed the instant Complaint alleging violations of his constitutional rights and retaliation. See generally [Compl.]. On November 19, 2018, the City of Gloucester answered the Complaint, and Chief McCarthy and Lt. Nicastro filed motions to dismiss, which were largely duplicative of each other. See [ECF Nos. 11–15]. On December 17, 2018, Officer Stuart opposed both motions to dismiss. See [ECF Nos. 18–21].

## II.     LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff's theory, and draw all reasonable inferences from those facts in favor of the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). While detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and it must

contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citing Centro Médico del Turabo, Inc. v. Felicano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)). The facts alleged must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).

When assessing the sufficiency of a complaint, the Court first "separate[s] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224). "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556). Dismissal is appropriate if a plaintiff has not pled any set of facts entitling him to relief. See Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997).

## III. DISCUSSION

### A. Count One: Violation of Civil Rights, 42 U.S.C. § 1983

Officer Stuart asserts a claim under Section 1983 against the Defendants for alleged violations of his rights under the First and Fourteenth Amendments. [Compl. ¶¶ 102–05]. Specifically, Officer Stuart claims that Chief McCarthy's and Lt. Nicastro's actions, while they were acting under the color of law, interfered with his "right to free speech, right to participate in concerted union activity, right to Procedural and Substantive Due Process, right to continued

employment and the right to petition and seek redress from Governmental abuse without retaliation." [Id. ¶ 103].

        1.     <u>First Amendment</u>

Officer Stuart's first ground for his Section 1983 claim is an alleged violation of his First Amendment rights. [Compl. ¶ 103]. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I. As the Supreme Court has explained:

> The First Amendment creates "an open marketplace" in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference. The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves. And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed.

<u>Knox v. Serv. Emp'ees Int'l Union, Local 1000</u>, 567 U.S. 298, 309 (2012) (citations omitted).

Public employees do not surrender all of their First Amendment rights by virtue of their employment; "[r]ather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 417 (2006). In some circumstances, however, it may be appropriate for the government as an employer to limit or discipline the speech of a public employee. <u>See</u> <u>id.</u> at 418–19 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." (citing <u>Connick v. Myers</u>, 461 U.S. 138, 143 (1983))).

In consideration of these competing interests—the right of a citizen to speak freely and the need for public employers to operate effectively—the First Circuit has developed a three-part test to determine whether an adverse employment action against a public employee violates his

or her First Amendment rights. See Decotiis v. Whittemore, 635 F.3d 22, 29–30 (1st Cir. 2011);

Curran v. Cousins, 509 F.3d 36, 44–45 (1st Cir. 2007); Lewis v. City of Bos., 321 F.3d 207,

218–19 (1st Cir. 2003).

> First, a court must determine whether the employee spoke as a citizen on a matter of public concern. Second, the court must balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct.

Decotiis, 635 F.3d at 29–30 (citations omitted).

With regard to the first prong, a matter of public concern is "any matter of political,

social, or other concern to the community." Connick, 461 U.S. at 146. Speech is on a matter of

public concern when it relates to "official malfeasance, abuse of office, and neglect of duties."

Curran, 509 F.3d at 46; see Connick, 461 U.S. at 148 (observing that speech may involve a

matter of public concern if it attempts "to bring to light actual or potential wrongdoing or breach

of public trust" by a government official). In contrast, "when a public employee speaks as an

employee upon matters only of personal interest 'a federal court is not the appropriate forum in

which to review the wisdom of a personnel decision taken by a public agency.'" Taylor v. Town

of Freetown, 479 F. Supp. 2d 227, 236 (D. Mass. 2007) (citing Connick, 461 U.S. at 147). In

determining whether speech involves a matter of public concern, courts look to "the form and

context of the speech, with an eye to (1) 'whether the community has in fact manifested a

legitimate concern' in the subject, and (2) whether the employee's speech 'suggests a subjective

intent to contribute to . . . public discourse.'" McGunigle v. City of Quincy, 944 F. Supp. 2d

113, 120–22 (D. Mass. 2013) (quoting O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993)).

To determine whether a public employee was speaking as a citizen or speaking "pursuant to their official duties," a court should identify "the duties an employee actually is expected to perform" and then ask, "was the speech at issue made pursuant to those responsibilities." Decotiis, 635 F.3d at 31–32.  This requires "a hard look at the context of the speech," and courts may consider the following non-exclusive factors:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Id. at 32 (citations omitted).

The third prong requires an adverse employment action, which is defined more broadly in the context of Section 1983 actions than in the context of employment discrimination cases.  See McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 174 (D. Mass. 2015).  The inquiry into whether there was an adverse employment action "'focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views'—or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights."  Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (quoting Bergeron v. Cabral, 560 F.3d 1, 8 (1st Cir. 2009)).  Concerning the requisite causation, "[a]lthough close temporal proximity between two events may give rise to an inference of causal connection, that inference is not necessarily conclusive."  McGunigle, 132 F. Supp. 3d at 174 (citing Lewis, 321 F.3d at 219).

Here, Defendants challenge Officer Stuart's ability to meet the first and third prongs of the three-part test with respect to his union-related and whistleblowing speech.  See [ECF No. 13

at 11–12; ECF No. 15 at 8–9].  They argue that the speech at issue was not protected citizen speech because it was made in Officer Stuart's capacity as a police officer or a union representative.  See [ECF No. 13 at 11–12; ECF No. 15 at 8–9].  They further contend that, even if the speech had been protected, the Complaint does not allege facts sufficient to show that the speech was a "substantial or motivating factor" in Officer Stuart's termination.  See [ECF No. 13 at 11–12; ECF No. 15 at 8–9].  Officer Stuart responds that the speech at issue was protected by the First Amendment because it fell "outside the heartland of his . . . typical responsibilities" and outside of the chain of command.  See [ECF No. 19 at 12, 14–15; ECF No. 21 at 11, 14–15].  He adds that "[t]he timeline of the facts presented in the pleadings reflect that [Officer Stuart's] complaints coincide with the commencement of multiple adverse employment action[s]."  [ECF No. 19 at 17; ECF No. 21 at 17].

As the First Circuit has observed, "[n]avigating the shoals of the standard articulated by the Supreme Court in Garcetti v. Ceballos, 547 U.S. 410 . . . (2006), has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact-intensive and context specific."  Decotiis, 635 F.3d at 26.  This is true here where the Complaint lacks many of the facts required to undertake the full analysis as outlined in Decotiis v. Whittemore, 635 F.3d 22 (1st Cir. 2011), concerning whether or not the relevant speech is on a matter of public concern and spoken by an employee as a citizen or pursuant to their job responsibilities.  For example, the Court identified seven instances of speech in the Complaint, namely, (i) the May 11, 2017 meeting with Director Leete, (ii) the May 11, 2017 follow-up letter to Director Leete, (iii) the undated unfair labor practices complaint filed against Chief McCarthy and the City of Gloucester, (iv) the September 28, 2017 letter to Mayor Theken, (v) the December 12, 2017 written report to Chief McCarthy, (vi) the undated formal report made to

Chief McCarthy, and (vii) the March 28, 2018 criminal complaint filed with the Office of the Attorney General. See [Compl. ¶¶ 19–21, 25, 32, 43–45, 54, 84]. The Complaint does not detail the content of the unfair labor practices complaint or the formal report made to Chief McCarthy, nor does it fully describe the "form and context" of the speech identified in the Complaint.

Even so, the facts alleged in the Complaint plausibly set forth that Officer Stuart was engaged in some speech related to matters of public concern. For example, he raised concerns about officers changing arrest reports and spoke about union members possibly being intimidated by GPD officers. [Compl. ¶¶ 43–45, 54, 86]. Both topics relate to "official malfeasance, abuse of office, and neglect of duties" and seek to shed light on wrongdoing, which is inherently a matter of public concern. Curran, 509 F.3d at 46.[3]

In addition, the Complaint also plausibly alleges that Officer Stuart was not speaking pursuant to his official duties when he spoke on matters of public concern. Although the Complaint does not specifically outline Officer Stuart's job responsibilities, some of his speech plainly falls outside what would be expected of a typical police officer. For example, the criminal complaint Officer Stuart filed with the Office of the Attorney General is likely to have fallen outside of his regular responsibilities as a police officer and to be more akin to citizen speech. See [Compl. ¶ 84]; Garcetti, 547 U.S. at 423–24 (identifying as citizen speech public statements, writing a letter to a local newspaper, or discussing politics with a coworker).

Finally, the factual allegations plausibly demonstrate that Officer Stuart's protected speech was a substantial or motivating factor in an adverse employment action. The adverse employment actions that Officer Stuart experienced include at least one investigation resulting in

---

[3] The Court notes that, on the facts presented in the Complaint, several of the instances of speech do not appear to involve matters of public concern because they relate to discipline of personnel, the investigation into Officer Stuart, and union concerns about the GPD's internal audit. See, e.g., [ECF No. 1 ¶¶ 19–21, 25, 32].

termination.  See, e.g., [Compl. ¶¶ 22, 71, 97].[4]  The Complaint alleges that Chief McCarthy initiated the investigation into the December 28, 2017 incident, see [Compl. ¶¶ 93–94], and permits the inference that Officer Stuart's protected speech was a substantial or motivating factor in Chief McCarthy's decision to initiate the investigation.  As an example, the investigation into the December 28, 2017 conduct was opened by Chief McCarthy after Officer Stuart had filed an unfair labor practices complaint against him and had filed several complaints about misconduct in the GPD.  See, e.g., [Compl. ¶¶ 25, 43–44, 54, 91].  Although the incident occurred on December 28, 2017 and Chief McCarthy testified that he began "look[ing] into" the incident when he was contacted by a local newspaper on December 29, Officer Stuart was not notified of the investigation until February 21, 2018, the same month in which the report on Lt. Nicastro's conduct was released.  [Compl. ¶¶ 71, 92–94; ECF No. 1-7].

In contrast, Lt. Nicastro is not alleged to have been involved in initiating either investigation into Officer Stuart and was not plausibly involved in terminating Officer Stuart's employment at the GPD.  For this reason, the Complaint only alleges a First Amendment retaliation claim against Chief McCarthy and does not adequately allege such a claim against Lt. Nicastro.

2.    Procedural Due Process

As a second ground for his Section 1983 claim, Officer Stuart asserts that his right to procedural due process was violated by Chief McCarthy and Lt. Nicastro.  [Compl. ¶ 103].  The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV.

---

[4] It is not necessary to decide at this stage whether other alleged harassment experienced by Officer Stuart had "a chilling effect on [his] exercise of First Amendment rights."  See Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011).

"Procedural due process" affords all citizens a right to notice and a right to be heard before the state deprives them of a protected property interest. See Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011). To state a procedural due process claim, Officer Stuart must allege that: (1) he, as a government employee, possessed a property interest in his continued employment; and, (2) Defendants, acting under color of state law, deprived him of that property interest without a constitutionally adequate process. See Mimiya Hosp., Inc. v. U.S. Dep't of Health & Human Servs., 331 F.3d 178, 181 (1st Cir. 2003); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985); Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 6 (1st Cir. 2000).

Here, Officer Stuart alleges that he was terminated without adequate due process because he did not receive a "meaningful hearing." [ECF No. 19 at 19]. Specifically, he alleges that Mr. Donovan (i) was not an impartial adjudicator; (ii) was not properly licensed to conduct investigations; (iii) refused to provide Officer Stuart with the video of the December 28, 2017 incident prior to an interview about the incident; and, (iv) prepared an incomplete report of the December 28, 2017 incident that lacked audio or transcripts of interviews conducted by Mr. Donovan. [Id. at 18–19]. The parties do not dispute that Officer Stuart had a constitutional interest in continued employment as a police officer, but do contest whether he received adequate process.[5] See [ECF No. 13 at 12–13; ECF No. 19 at 18–19].

Officer Stuart's claims regarding the process he received are not based on a lack of pre-termination proceedings, but rather on "alleged random and unauthorized acts," based on Mr. Donovan's alleged bias. Thomas v. Town of Salisbury, 134 F. Supp. 3d 633, 646 (D. Mass. 2015) (quoting Cronin v. Town of Amesbury, 81 F.3d 257, 260 n.2 (1st Cir. 1996)). Thus,

---

[5] Officer Stuart's opposition to Lt. Nicastro's motion to dismiss [ECF No. 21] does not address Lt. Nicastro's arguments challenging the procedural due process claim.

Officer Stuart may only succeed on his procedural due process claim by showing that he was not provided with an adequate post-deprivation remedy. See Hadfield v. McDonough, 407 F.3d 11, 21 (1st Cir. 2005) ("Having concluded that any deprivation of process was caused by random and unauthorized conduct by the due process defendants, we turn to whether Massachusetts law provided [plaintiff] with an adequate postdeprivation remedy."); see, e.g., Cronin, 81 F.3d at 260 (addressing claims of terminated chief of police that defendants were "out to get him" and that the town manager was biased and made evidentiary errors); Thomas, 134 F. Supp. 3d at 646 (addressing terminated police officer's claim that chief of police and town manager were biased against him).

Officer Stuart has not plausibly alleged that he was not provided with an adequate post-deprivation remedy. Indeed, his termination letter advised him of his "right to appeal this employment action either through the grievance/arbitration process specified in [his] collective bargaining agreement or through the Civil Service Commission, as specified in M.G.L. Chapter 31, sections 41–45 . . . ."[6] [ECF No. 13-1 at 1]. The First Circuit has concluded that Massachusetts' Civil Service Law, Mass. Gen. Laws ch. 31, §§ 41–44, provides an adequate postdeprivation remedy, absent extraordinarily long delays or other issues that may render the existing remedy inadequate. See Cronin, 81 F.3d at 260–61. No such shortcomings are alleged here.

---

[6] The Court may properly consider the termination letter on a motion to dismiss without converting the motion into a motion for summary judgment where the document is incorporated by reference in the Complaint. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) (noting that courts may consider "the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment"). Here, Officer Stuart quoted from the termination letter in the Complaint, but did not attach it. See [Compl. ¶ 97].

3. <u>Substantive Due Process</u>

The third ground Officer Stuart proffers in support of his Section 1983 claim is a violation of his substantive due process rights. [Compl. ¶ 103]. "In order to assert a valid substantive due process claim, [a plaintiff has] to prove that they suffered the deprivation of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocks the conscience." <u>Clark v. Boscher</u>, 514 F.3d 107, 112 (1st Cir. 2008). Whether conduct "shocks the conscience" is a highly fact-specific inquiry, but the First Circuit has instructed that "in order to shock the conscience, conduct must at the very least be extreme and egregious, or . . . truly outrageous, uncivilized, and intolerable." <u>Pagan v. Calderon</u>, 448 F.3d 16, 32 (1st Cir. 2006) (citations omitted).

Officer Stuart characterizes as "egregiously unacceptable as well as outrageous" the allegedly flawed and biased investigation into the December 28, 2017 incident, the "inherent unfairness of the termination hearing," and the notice posted by Chief McCarthy following Officer Stuart's termination.[7] [ECF No. 19 at 20]. He also argues that his termination was based on "personal animosity and anger" for speaking out against Lt. Nicastro and Chief McCarthy rather than for the improper use of force. [<u>Id.</u> at 20]. As with the procedural due process claim, the parties do not dispute that Officer Stuart's termination deprived him of a protected interest, but contest whether the conduct alleged rises to the level of "conscience-shocking behavior" required to state a claim for a substantive due process violation. <u>See</u> [ECF No. 13 at 13–14; ECF No. 15 at 10–11].

---

[7] Each of these actions relates to Chief McCarthy. Officer Stuart does not address a substantive due process violation by Lt. Nicastro in his briefing despite Lt. Nicastro moving to have the substantive due process claim dismissed. <u>See</u> [ECF No. 15 at 10–11].

Here, the conduct alleged by Officer Stuart is similar to <u>Thomas v. Town of Salisbury</u>, 134 F. Supp. 633 (D. Mass. 2015), where the court rejected a police officer's substantive due process claim premised on an allegedly unfair investigation that resulted in termination.[8] 134 F. Supp. 3d at 647. In <u>Thomas</u>, the police officer asserted that the investigator had ties to the police department, was not authorized by the Board of Selectmen, was biased, coached witnesses to provide negative information, and did not provide discovery prior to the disciplinary hearing. <u>Id.</u> at 639–40. Upon a review of case law, the court dismissed the police officer's substantive due process claim because it could not identify any cases "where such conduct, even if motivated by bad faith, supports a substantive due process violation." <u>Id.</u> at 647.

Officer Stuart does not address <u>Thomas</u> directly, but proffers his own case, <u>Brothers v. Town of Millbury</u>, No. 14-cv-10122, 2014 U.S. Dist. LEXIS 112968, at *10 (D. Mass. Aug. 14, 2014). In <u>Brothers</u>, a police officer, Kimberly Brothers ("Officer Brothers"), was assigned to investigate a fellow officer for misconduct, and the town hired a member of another town's police internal affairs unit, Richard Bates ("Officer Bates"), to assist her. 2014 U.S. Dist. LEXIS 112968, at *2–3. Officer Brothers had previously taken a graduate course taught by Officer Bates, and she had complained to school officials about how he conducted the class, which resulted in Officer Bates not being asked to return to teach. <u>Id.</u> at *3. Officer Brothers alleged that the investigation she was conducting turned into an investigation of her. <u>Id.</u> She also alleged that Officer Bates interviewed a number of witnesses and then destroyed the records of those interviews, which would have exonerated her. <u>Id.</u> at *3–4. After a sixteen-day investigation, Officer Bates found that Officer Brothers had "committed (1) untruthfulness in a police report, (2) untruthfulness in an affidavit, and (3) intimidated town residents." <u>Id.</u> at *4.

<hr>

[8] The termination was reversed following an appeal through appropriate channels. <u>Thomas v. Town of Salisbury</u>, 134 F. Supp. 3d 633, 647 (D. Mass. 2015).

Officer Brothers was eventually terminated.  Id. at *4–5.  The court concluded that Officer Bates' actions, which could have been fueled by retaliation for his lost teaching position, were egregious and conscience-shocking.  Id. at *10.

Although Brothers shares some similarities with this case, such as an allegedly biased investigator, it goes well beyond what is alleged here.  For example, in Brothers the terminated officer had a previously relationship with the investigator, whereas Mr. Donovan's alleged bias stems from previous work done for the GPD, which included interviewing Officer Stuart as part of the investigation into Lt. Nicastro.  See [Compl. ¶¶ 55–56, 72].  In addition, Brothers involved the destruction of potentially exculpatory evidence, a factor not present in either Thomas or the instant case, and one that sets it apart.  None of the conduct alleged here, while potentially "embarrassing" or "unfair," is as conscience-shocking as the destruction of potentially exculpatory evidence.  As the court held in Thomas, claims that an investigation and resulting disciplinary hearing were simply "unfair" or "biased" do not rise of the level of a substantive due process violation.  See 134 F. Supp. 3d at 647; cf. Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (describing the "hallmark" of successful substantive due process challenges as "violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience" (quoting González-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010)).

### 4.    Qualified Immunity

Because Officer Stuart has successfully alleged a violation of his First Amendment rights by Chief McCarthy, the Court will briefly address Chief McCarthy's defense of qualified immunity.  Qualified immunity protects public officials, in their individual capacity, "from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

To determine whether a defendant is entitled to qualified immunity, the Court undertakes a two-step inquiry to determine: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 268–69 (1st Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Determining whether a right is "clearly established" is a two-part inquiry. "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his [or her] conduct violated that rule of law." Id. (citing Wilson v. City of Bos., 421 F.3d 45, 57–58 (1st Cir. 2005)).

Here, as discussed supra, Officer Stuart has adequately pled a violation of his First Amendment right to engage in protected speech and to be free from workplace retaliation. See Section III.A.1., supra. Officer Stuart's "theory of liability is not so novel that the Court can determine, based on the pleadings alone, that his rights were not 'clearly established' or that a reasonable person would not have been aware of said rights." Stone v. Worcester Cty. Sheriff's Office, No. 18-cv-10011-ADB, 2019 WL 1367768, at *5 (D. Mass. Mar. 26, 2019). Accordingly, the Court denies Chief McCarthy's motion to dismiss to the extent it seeks

qualified immunity on the First Amendment claim. Chief McCarthy may raise this defense again when the factual record has been more sufficiently developed.

**B.    Count Three: Violation of Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, 11I**

Officer Stuart also asserts a claim under the MCRA for alleged violations of his "right to free speech, protected right to participate in union activity, [and] right of continued employment and Due Process of Law." [Compl. ¶¶ 112–13]. The MCRA is the Commonwealth's "counterpart" to Section 1983 and is "basically coextensive with the federal statute," with some differences in the required elements. Fletcher v. Szostkiewicz, 190 F. Supp. 2d 217, 230 (D. Mass. 2002).

To establish a claim under the MCRA, a plaintiff must prove that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." Currier v. Nat'l Bd. of Med. Exam'rs, 965 N.E.2d 829, 837–38 (Mass. 2012). "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). "Generally, by itself, a threat to use lawful means to reach an intended result is not actionable under [the MCRA]." Buster v. George W. Moore, Inc., 783 N.E.2d 399, 411 (Mass. 2003). "'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct." Planned Parenthood League of Mass., 631 N.E.2d at 990. Finally, "coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Id.

First, the MCRA claim against Lt. Nicastro cannot withstand a motion to dismiss for the same reasons as articulated supra concerning the Section 1983 claim. See Section III.A.1., supra.

The Complaint alleges only that Lt. Nicastro eavesdropped outside of Director Leete's office and ordered Officer Stuart to alter an arrest report. See [Compl. ¶¶ 20, 40–41]. Neither of these actions can plausibly be construed as interfering with Officer Stuart's exercise of his constitutional rights. Accordingly, the MCRA claim against Lt. Nicastro must be dismissed.

Second, regarding the allegations about Chief McCarthy, the parties primarily dispute whether the Complaint adequately alleges "threats, intimidation, or coercion." See [ECF No. 13 at 16; ECF No. 19 at 22–23]. Officer Stuart argues that his termination caused a significant monetary loss that equates to "economic coercion" sufficient to sustain an MCRA claim. [ECF No. 19 at 23]. "[I]n certain circumstances, economic coercion, standing alone, may be actionable under the [MCRA]," however, "economic loss occasioned by a plaintiff's own conduct . . . is beyond [the] bounds [of the MCRA]." Buster, 783 N.E.2d at 411–12. In addition, the First Circuit has repeatedly recognized that "the exception for claims based on non-physical coercion remains a narrow one." Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Nolan v. CN8, 656 F.3d 71, 77–78 (1st Cir. 2011)).

This case does not present the narrow circumstances in which a court may find economic coercion rising to the level of an MCRA violation. The legal definition of "coercion" requires that one be "constrain[ed] . . . to do against his will something he would not otherwise have done." Planned Parenthood League of Mass., 631 N.E.2d at 990. Officer Stuart does not allege in the Complaint or indicate in his briefing, and the Court cannot identify, any action that Officer Stuart took or did not take as a result of the alleged economic coercion. Accordingly, the Complaint does not adequately allege that Officer Stuart was subject to economic coercion and, therefore, his MCRA claim against Chief McCarthy will be dismissed.

### C.     Count Four: Intentional Infliction of Emotional Distress

Officer Stuart's final claim against Defendants is that their conduct was extreme and outrageous and resulted in the intentional infliction of emotional distress ("IIED"). [Compl. ¶¶ 115–19]. To prevail on a motion to dismiss on an IIED claim, Officer Stuart must allege sufficient facts to prove (1) that the defendant acted with the intent to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that defendant's conduct actually caused the emotional distress plaintiff allegedly suffered; and (4) that the emotional distress plaintiff suffered was severe. Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 487 (D. Mass. 2018) (quoting Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)).

Defendants argue that the IIED claim against them should be dismissed because the factual allegations of the Complaint do not contain any "extreme and outrageous" conduct by either Chief McCarthy or Lt. Nicastro. See [ECF No. 13 at 17; ECF No. 15 at 14–15]. In response, Officer Stuart alludes to "threatening actions" but does not identify any specific factual allegations to support his IIED claim. See [ECF No. 19 at 23; ECF No. 21 at 19–20].

The Complaint alleges that Chief McCarthy sent Officer Stuart a memorandum advising Officer Stuart that he was under investigation concerning his May 11, 2017 letter, "threatened" Officer Stuart that the investigation could result in discipline, refused to allow Officer Stuart to return to work following his IOD leave without additional documentation, sent Officer Stuart a memorandum advising him of the investigation following the December 2018 incident, testified at the disciplinary hearing regarding the December 2018 events, and posted a notice of Officer Stuart's termination. [Compl. ¶¶ 22–24, 29, 71, 90–94, 98]. The Complaint also alleges that Lt. Nicastro attempted to listen to a meeting Officer Stuart had with Director Leete, instructed Officer Stuart to make changes to an arrest report, and changed another arrest report. [Id. ¶¶ 20, 40–41, 51]. Officer Stuart also alleges that he "has been subjected to repeated threats,

24

intimidation and coercion by multiple members of the Gloucester Police Department for questioning his supervisor's actions and his refusal to participate in activities which he reasonably believes constitute a violation of numerous state laws and threats to public safety." [Id. ¶ 100; see also ¶¶ 88–89]. The Complaint, however, does not substantiate this statement or expound on the circumstances of such "threats, intimidation and coercion," apart from the incidents outlined above.

None of these factual allegations rises to the level of demonstrating the "extreme and outrageous" conduct required of an IIED claim. See McDonald v. City of Bos., 334 F. Supp. 3d 429, 441 (D. Mass. 2018) (stating that, to meet the "extreme and outrageous" element of an IIED claim, conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013)). Accordingly, the IIED claim as against Chief McCarthy and Lt. Nicastro in their individual capacities is dismissed.

### D. Official Capacity Claims

Officer Stuart asserts his Section 1983, MCRA, and intentional infliction of emotional distress claims against Chief McCarthy and Lt. Nicastro in their official and individual capacities. See [Compl. at 14–16]. For the forgoing reasons, each of these official capacity claims must be dismissed as deficient.

#### 1. Section 1983

"A suit against a public official in his official capacity is a suit against the government entity" of which the official is an agent. Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 62 (1st Cir. 2015). State officials, such as police officers, are not "persons" within the meaning of Section 1983 when acting in their official capacities and are, therefore, not subject to suit in federal court without the Commonwealth's consent. Tyler v. Massachusetts, 981 F. Supp.

2d 92, 95 (D. Mass. 2013). Accordingly, a Section 1983 suit brought against a police officer or chief of a municipal police department in his or her official capacity is a suit against the municipality itself. See Murphy v. Town of Natick, 516 F. Supp. 2d 153, 158 (D. Mass. 2007); see also Brandon v. Holt, 469 U.S. 464, 471–72 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . ."). Here, where Officer Stuart has brought his Section 1983 claim against both the City of Gloucester and Chief McCarthy and Lt. Nicastro in their official capacities as officers of the GPD, the claims against Chief McCarthy and Lt. Nicastro in their official capacities are duplicative of the claim against the City of Gloucester and will be dismissed.

### 2. MCRA

Officer Stuart's MCRA claims against Chief McCarthy and Lt. Nicastro in their official capacities are also effectively claims against the City of Gloucester, and, as such, they must be dismissed because municipalities cannot be sued under the MCRA. See Fletcher, 190 F. Supp. 2d at 230; Kelley, 288 F.3d at 11 n.9 ("[U]nder Massachusetts law a municipality cannot be sued under the MCRA."); Howcroft v. City of Peabody, 747 N.E.2d at 744–45 (affirming summary judgment on MCRA claim in favor of individual defendants in their official capacities because neither Commonwealth nor its subdivisions is a "person" under the MCRA).

### 3. Intentional Infliction of Emotional Distress

In his responses to the motions to dismiss, Officer Stuart disclaims that the Complaint asserts the IIED claim against Defendants in their official capacity. See [ECF No. 19 at 23 ("Plaintiff's claim for intentional infliction of emotional distress is against [Chief McCarthy] in his *individual* capacity."); ECF No. 21 at 19 (same regarding Lt. Nicastro)]. Regardless, the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 10(c), precludes tort suits against

municipalities of the Commonwealth, which encompasses tort suits brought against police officers in their official capacities. Opalenik v. LaBrie, 945 F. Supp. 2d 168, 174, 195 (D. Mass. 2013). Accordingly, Officer Stuart's IIED claims against Chief McCarthy and Lt. Nicastro in their official capacities are dismissed.

## IV. CONCLUSION

Accordingly, Chief McCarthy's motion to dismiss [ECF No. 12] is <u>GRANTED</u> in part and <u>DENIED</u> in part, and Lt. Nicastro's motion to dismiss [ECF No. 14] is <u>GRANTED</u>. All counts are dismissed as against Lt. Nicastro. Count I (Section 1983) is dismissed as against Chief McCarthy in his official capacity. Count I is dismissed in part as against Chief McCarthy in his individual capacity only to the extent that it relates to alleged violations of Officer Stuart's Fourteenth Amendment rights. Count III (MCRA) and IV (Intentional Infliction of Emotional Distress) are dismissed as against Chief McCarthy in both his individual and official capacities.

**SO ORDERED.**

July 15, 2019                                          /s/ Allison D. Burroughs
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE