COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF LABOR RELATIONS

*********************************************************

| | | |
|---|---|---|
| In the Matter of | * | |
| | * | |
| CITY OF GLOUCESTER | * | |
| | * | Case No.    MUP-17-6076 |
| | * | |
| and | * | Date Issued: September 5, 2019 |
| | * | |
| GLOUCESTER POLICE PATROLMEN'S | * | |
| ASSOCIATION, MCOP, LOCAL 344 | * | |
| | * | |

*********************************************************

Hearing Officer:

     Kerry Bonner, Esq.

Appearances:

     Thomas Mullen, Esq.:          Representing the City of Gloucester

     Ryan Murphy, Esq.:          Representing the Gloucester Police
                                      Patrolmen's Association

<u>HEARING OFFICER'S DECISION</u>

<u>Summary</u>

1      The issue in this case is whether the City of Gloucester (City or Employer) violated

2   Section 10(a)(1) of Massachusetts General Laws Chapter 150E (the Law) by ordering the

3   Gloucester Police Patrolmen's Association (Association, Union or GPPA) President to

4   answer questions concerning his conduct as Association President and by making certain

5   statements to a bargaining unit member regarding the Association President's actions to

6   revise a detail pay rate.  Based on the record and for the reasons explained below, I find

7   that the City violated the Law as alleged.

H.O. Decision (cont'd)                                            MUP-17-6076

## Statement of the Case

1    On July 13, 2017, the Association filed a Charge of Prohibited Practice with the

2    Department of Labor Relations (DLR) alleging that the City had engaged in prohibited

3    practices within the meaning of Sections 10(a)(1) and 10(a)(3) of the Law.  On September

4    11, 2017, the Association filed a Motion to Amend the Charge and an Amended Charge.

5    On December 12, 2017, a DLR investigator issued a Complaint of Prohibited Practice

6    and Partial Dismissal (Complaint),[1] which alleges that the City violated Section 10(a)(1)

7    of the Law when the Chief of Police ordered the Association President to answer certain

8    questions regarding his union activity as part of an internal investigation, and when the

9    Chief made negative comments to unit members about a pending grievance involving

10   detail pay.  On December 21, 2017, the City filed an Answer to the Complaint.  I conducted

11   a hearing on January 9, 2019, January 22, 2019, February 26, 2019 and March 18, 2019.

12   Following the hearing, the Association and City each timely filed post-hearing briefs.

13   Based on the entire record, including my observation of the witnesses' demeanor, I make

14   the following findings of fact and render the following opinion.

## Stipulations of Fact

15   1. The Respondent, the [City], is a public employer within the meaning of Section 1
16      of G.L. c. 150E (hereinafter, "the Law").
17
18   2. The [Union] is an employee organization within the meaning of Section 1 of the
19      Law.

---

[1] The Investigator dismissed a Section 10(a)(2) allegation, which appears to have been raised by the Association at the in-person investigation as it was not included in the original or amended charge of prohibited practice.  Additionally, the Association verbally withdrew the Section 10(a)(3) allegation on the first day of hearing.

H.O. Decision (cont'd)                                              MUP-17-6076

3. The Union is the exclusive bargaining representative for certain police officers employed by the City at the Gloucester Police Department (Department).

4. At all relevant times, John McCarthy, the Chief of the Department, was an agent of the Employer.

5. At all relevant times in 2017, Leon Stuart was a patrol officer, member of the bargaining unit, and President of the Union.

6. At all relevant times, Stephen Lamberis was a patrol officer and member of the bargaining unit represented by the Union.

<u>Findings of Fact</u>

**May 11, 2017 Meeting**

In or around May 2017, following a verbal altercation between members of the Association and the Gloucester Superior Officers Association (GSOA) at an Association member's wake, there was continuing friction and discord between the two unions.[2]  On May 11, 2017, Leon Stuart (Stuart), Association President at the time, met with Donna Leete (Leete), Human Resources Director, in her office at City Hall to discuss the Association unit members' complaints that they had been mistreated by GSOA members at the wake.  About 15-20 minutes into this meeting, Michael Williams (Williams), GSOA President, joined them.[3]

---

[2] Other events also contributed to the friction between the two unions, but they are not relevant to my decision.

[3] Williams was planning to speak just with Leete, but when he arrived, he learned that Stuart was already meeting with Leete.

3

1    After speaking for a short while, they heard voices and the chirp of a police radio

2    on the other side of Leete's closed solid wood door.  They began to speak in hushed

3    tones for a few seconds.[4]  Leete then opened the door and saw the backs of Police

4    Lieutenant David Quinn (Quinn) and Sergeant Jeremiah Nicastro (Nicastro).[5]  Shortly

5    thereafter, Williams looked out the window and saw Quinn and Nicastro leaving City Hall.

6        Following the meeting, Stuart advised Susan Horwitz (Horwitz), Association

7    counsel, that he believed Quinn and Nicastro had been eavesdropping during his meeting

8    with Leete.  Horwitz therefore sent the following letter to Leete[6] on May 11, 2017:

9        As you know, there is an ongoing investigation concerning inappropriate
10       statements made by Lieutenant David Quinn at the wake for Patrol Officer
11       Heath Moseley.  The Gloucester Police Patrol Officers Association and its
12       members are very disturbed about the conduct of Lieutenant Quinn at the
13       wake.  It is insulting to the memory of Officer Moseley and very disrespectful
14       of Officer Moseley's family and to the men and women of the Gloucester
15       Police Department.  Lieutenant Quinn's conduct is clearly unbecoming a
16       police officer.
17
18       Because of the actions of Lieutenant Quinn, Union President Stuart came
19       to your office today to express the concerns of the GPPA bargaining unit
20       officers and to insure that the City takes appropriate action to make sure

---

[4] Stuart testified that Leete started to whisper only after opening the door and seeing the backs of two superior officers. Both Leete and Williams testified that the whispering started after hearing noises outside but ended once Leete opened the door. I credit Leete's and Williams' testimony which was consistent and more plausible.

[5] Although Stuart testified that after Leete opened the door, she said that Quinn and Nicastro were listening to their conversation, neither Leete nor Williams recalled Leete making any such comment, and Leete credibly testified that she never ascertained that Quinn and Nicastro were listening outside the door. I credit Leete's testimony which is in accord with her subsequent actions, including her written communication to the Association the next day in which Leete concluded that Quinn and Nicastro had not listened outside her door.

[6] The letter was also copied to Gloucester Mayor Sefatia Romeo Theken (Mayor Theken).

4

H.O. Decision (cont'd)                                                    MUP-17-6076

1   that the members of the bargaining unit are not retaliated against or
2   intimidated by the Gloucester Superior Officers. While President Stuart was
3   in your office with the door closed so that he could express the Union's
4   concerns to you in privacy, you and he heard Sergeant Nicastro and
5   Lieutenant Quinn directly outside your door, clearly listening to your
6   discussion. Soon after you opened the door, they walked away and left. It
7   is clear that the actions of police department superior officers was intended
8   to further interfere with President Stuart's Union activity on behalf of his
9   members and to serve to intimidate President Stuart and his members.
10
11  The GPPA therefore insists that the City of Gloucester take action to
12  investigate the conduct of Gloucester Superior Officers and specifically
13  Lieutenant Quinn and Sergeant Nicastro, to insure that these supervisors
14  cease and desist from taking action to interfere with the GPPA and the
15  patrol officers of the Gloucester Police Department who are asserting their
16  rights under M.G.L.c. 150E.
17
18  We also see this continued inappropriate conduct and intimidation tactics
19  as further insult to the memory of Officer Heath Moseley and to his family.
20  This is entirely unacceptable.
21
22  If the City does not take action to address the conduct of these superior
23  officers, the Union will be compelled to file charges at the Department of
24  Labor Relations.
25
26  I appreciated [sic] your immediate attention to this matter.
27
28
29  **May 12, 2017 Meeting**
30
31  The City ordered Stuart and Williams to attend a meeting at City Hall on May 12,

32  2017 to discuss several issues, including the meeting in Leete's office on the previous

33  day. Mayor Theken, Chief of Police John McCarthy (McCarthy), Assistant HR Director

34  Holly Dougwillo (Dougwillo), and Leete also attended, among others. During the meeting,

35  Dougwillo recounted what she had seen the day before. Dougwillo had been in the

36  personnel office with a clear view of Leete's door. Dougwillo explained that she had

H.O. Decision (cont'd)                                            MUP-17-6076

1    noticed Nicastro and Quinn come up the stairs and approach Leete's office.  After a very

2    brief pause outside Leete's door, they went instead into the personnel office and had a

3    brief discussion with Dougwillo.[7]   Stuart acknowledged at the hearing that he heard

4    Dougwillo say that Nicastro and Quinn had not listened at Leete's door the day before.

5    However, he still believed, based on his own perceptions of what had taken place on the

6    previous day, that Quinn and Nicastro had eavesdropped on his conversation with Leete.[8]

7    McCarthy and Leete, however, believed that the matter was resolved at this point.

8            By email dated May 12, 2017, Leete advised Horwitz and Stuart of the following,

9    in relevant part:

10           Please accept this response to your letter of May 11, 2017.  This morning
11           Mayor Theken, Jim Destino, Chip Payson, Chief McCarthy, Assistant HR
12           Director Holly Dougwillo and I met with GPPA President Leon Stuart and
13           GSOA President Michael Williams.  Among the many subjects of discussion
14           were the continuing investigation into inappropriate and vulgar comments
15           made at the recent wake for Officer Moseley, the City's united stance
16           prohibiting intimidation or retaliation for anyone making a complaint or
17           serving as a witness to an internal investigation, and our strong commitment
18           to build and support a professional Police Department respected by the
19           community.

---

[7] Although Dougwillo indicated during her testimony that she did not recall that Quinn and Nicastro came to the personnel office and had a discussion with her on May 11, 2017, I conclude from the cumulative testimony of the other witnesses that a brief discussion did take place.  Both Quinn and Nicastro recall speaking with Dougwillo on May 11, 2017. Moreover, Williams, Stuart, Leete, and McCarthy all recall that on May 12, 2017, Dougwillo explained that she had briefly spoken with Quinn and Nicastro the day before when the two came to the personnel office after briefly pausing outside Leete's door.

[8] Stuart admitted that he knew Dougwillo to be truthful, and he felt "a little better" after hearing her account at the May 12 meeting, but that he still "had some underlying issues" and was not "completely comfortable."  He believed that the City had not fully investigated the matter and he knew that Quinn and Nicastro were outside Leete's door for long enough that those inside the meeting could hear their voices and police radio.

H.O. Decision (cont'd)                                                    MUP-17-6076

1
2      Ms. Dougwillo has clarified that while the 2 union presidents were meeting
3      with me in my office, she witnessed Lt. Quinn and Sgt. Nicastro approaching
4      my office door. Hearing voices, they then backed away from the door and
5      entered her office. There was no evidence that these officers were listening
6      to a private conversation or attempting to intimidate the union presidents.
7      Rather, it has been confirmed that Lt. Quinn, the subject of the ongoing
8      investigation, wished to speak with me directly. To ensure confidentiality in
9      my office going forward, we now ask all employees wishing to speak with
10     me privately to first approach the personnel office.
11
12     The City greatly appreciates President Stuart's position that all officers be
13     treated fairly with the same standards and his willingness to bring any
14     concerns forward for resolution. We look forward to working with the GPPA
15     proactively to resolve any and all concerns. Thank you.[9]
16
17     On May 12, 2017, Stuart directed Joseph Balbo (Balbo), Association Secretary, to

18     send Horwitz's May 11, 2017 letter to the bargaining unit. Balbo sent the following

19     email,[10] to the membership: "PLEASE READ THE ATTACHED DOCUMENT. THE

20     ABOVE DOCUMENT IS FOR GPPA MEMBERS ONLY" and he attached Horwitz's May

21     11, 2017 letter to Leete.[11]

22     A few days later, Stuart directed Balbo to also forward Leete's May 12, 2017 email

23     to the Association membership to keep them updated. On May 16, 2017, Balbo sent an

---

[9] Stuart testified that he did not agree with the conclusion in Leete's letter.

[10] Balbo used his personal email address to send the email to the members' personal email addresses. The Union would often communicate via personal email, rather than their City email addresses.

[11] Stuart testified that he wished to forward this letter to the members to keep them updated "on what was going on, where it was, and what we planned on doing."

7

H.O. Decision (cont'd)                                           MUP-17-6076

1    email entitled "update."[12]   Balbo wrote, in part, that "first is the response from the city

2    regarding the previous email," and he copied Leete's May 12 letter.

3        On May 18, 2017, Stuart sent the following email to Union members:

4        As most of you are aware we have had two incidents over the last two
5        weeks.  By now you all know the details, but thought it best to send out a
6        personal email to the body.  I would like to add the G.P.P.A. has no control
7        over where and when events like these will happen.  I feel it's very
8        unfortunate that one happened at Health's wake and another during the
9        night he was escorted home from the Medical Examiner's office.   Two
10       officers came forward with complaints of discourteous [sic] and disrespect,
11       and sought union representation. As you're aware our attorney Susan
12       Horwitz served the city with our complaint on any possible intimidation, or
13       retaliation to any member who could be involved as victims, or witnesses in
14       any investigation. When Susan wrote this complaint she did as our legal
15       counsel, but she and Heath also became friends over the last year. Susan
16       did attend Heath's wake to pay her respects to the family. I fully support the
17       complaint and the way it was written. I personally read and approved the
18       complaint before it was served. I do understand that we all have our own
19       opinions on the content of the complaint, but where and when it happened
20       and who it potentially effected [sic], were very important elements of the
21       complaint. This type of conduct is not acceptable at any time or place, and
22       as Union President it's my obligation to protect the membership from this
23       type of offensive behavior. I realize that some of you have heard many
24       things coming from the others and they may feel they should not be held to
25       the same standards as everyone else. I assure you that I plan to follow
26       through to the end and fight for equal rights, treatment and accountability. I
27       appreciate the officers who came forward and wrote reports on their
28       observations. One last thanks to the members who have reached out in
29       support of my efforts. I realize that some members are still reluctant to take
30       one side or the other, but you're not forgotten and I do understand your
31       concerns for staying quiet. I hope when this is over the membership will
32       know that they can come to work with no fear of being targeted for any
33       reason.[13]

_____

[12] Balbo's May 16, 2017 email also addressed other matters that are not relevant here.
[13] Stuart sent this email to the membership to let them know that, as the Association President, he was "going to continue to fight for equal rights, equal treatments, and not let my members be belittled by any other supervisor or any other patrolman for that matter, especially at a fellow officer's funeral or any other place."

H.O. Decision (cont'd)                                              MUP-17-6076

1    **Quinn and Nicastro Submit Complaints against Stuart**

2           On May 12, 2017, an Association member informed Nicastro that Horwitz's letter,

3    which had complained about him and Quinn, had been sent to all Association members.

4    This Association member also provided Nicastro with a copy of the letter.  Nicastro then

5    texted Quinn to inform him about this development.  Both Nicastro and Quinn were very

6    upset that Horwitz's letter, which they deemed to include false allegations about them,

7    had been sent out to all Association members.[14]  On May 12, 2017, Nicastro emailed

8    Leete and McCarthy to request a copy of the "false accusation from mass cops attorney

9    that was initiated by Officer Stuart, and Lt. Williams..."  He complained that:

10          This letter of allegation from the Masscops attorney has been forwarded to
11          the entire patrolmans Union by Officer Stuart.  Even though [O]fficer Stuart
12          [k]nows this allegation is completely false he shared this with his entire Union
13          body and this is nothing but insubordination of a sergeant and a Lieutenant
14          which affects the daily routine of the police department.  The letter states
15          [D]onna [L]eete caught us listening at her door during a closed door meeting.
16          I can attest that Donna Leete never said such thing as it wasn't true...
17
18   Nicastro also wrote that "This allegation is nothing but a fabricated lie and the fact the

19   Union attorney email was shared throughout is clearly undermining our authority and

20   creating more disruption within the police department."

21          Nicastro followed up the above email with a request for an investigation.  On the

22   following day, May 13, 2017, Nicastro emailed Leete and McCarthy, in part, as follows:

---

[14] Nicastro was humiliated and embarrassed by the allegations and believed they impacted his performance at his upcoming promotional interview.  He did not receive the promotion.  Quinn was also mortified by the allegations, which caused him to have a strong emotional reaction at home.

9

H.O. Decision (cont'd)                                            MUP-17-6076

1    I have read the complaint from Susan Horwitz's [sic] on behalf of Lt Mike
2    Williams and Leon Stuart, one who is GSOA PRESIDENT.
3
4    The letter demands an internal investigation into LT Quinn and I getting
5    caught by Donna Leete listening at her door. As Mrs. Leete knows this is a
6    complete lie and it shouldn't be allowed without discipline.
7
8    Not only are they requesting an internal investigation but Lt. Quinn and I are
9    demanding it to protect my integrity within the police department…
10
11   I'm disgusted that [a] member of this police department can accuse and LIE
12   about other members of wrongdoing to tarnish their reputation with no
13   punishment from the city.
14
15   Not only is mass cops recommending action be taken so am I. I am
16   requesting an independent internal investigation with [a] lie detector test to
17   prove that this allegation that was shared throughout the entire police
18   department by Officer Stuart was in fact a [l]ie. My reputation and integrity
19   within the police department has been jeopardized by a lie from [O]officer
20   Stuart and Mike Williams.
21
22   Once that is a lie proven and accusation like this is proven false [sic] it must
23   be followed with charges of conduct unbecoming of a police officer and
24   should be dealt with accordingly.
25
26 Nicastro concluded his email by stating that "I am request [sic] a full investigation into the

27 truthfulness into this false allegation. Once proven a lie I would expect action be taken to

28 restore the normal routine of the police department. This false accusation has caused

29 me and my family excessive stress and it's uncalled for."

30      Quinn did not submit a request in writing, but he verbally complained to McCarthy

31 that he had been falsely accused of listening outside Leete's door and requested that

32 McCarthy investigate Stuart's distribution of Horwitz's letter.

33 **Investigation into Officers' Complaints**

34      According to the Department's Policy and Procedure No. 4.01:

H.O. Decision (cont'd)                                                    MUP-17-6076

1    It is the policy of this department to:
2
3            A.  Investigate all complaints, including anonymous complaints,
4                against the department or a member of the department,
5                regardless of the source of such complaints through a
6                regulated, fair, and impartial Internal Affairs Program;
7            B.  Determine whether or not such complaints are valid; and
8            C.  Take appropriate action.
9
10   The policy sets forth that the complaint can be verbal or written and that all complaints

11   must be investigated.

12          After receiving complaints from Nicastro and Quinn, McCarthy initiated an

13   investigation into Stuart's conduct.[15] He first spoke with Balbo, who had sent out Horwitz'

14   letter to the bargaining unit members.  McCarthy asked Balbo if he had sent the Horwitz

15   letter out on his own.  Balbo responded that Stuart had instructed him to send the letter.

16   McCarthy asked him if he was aware of the May 12, 2017 meeting which addressed, and

17   in his mind resolved, the allegations in the Horwitz letter.  Balbo indicated he had been

18   unaware of that meeting at the time he sent Horwitz's letter to the membership.

19          On June 29, 2017, Chief McCarthy sent the following to Stuart, regarding "Incident

20   at Personnel Office – May 11, 2017," in relevant part:

21          After receiving formal complaints from two ranking officers of this
22          department, I am conducting an investigation into the events of May 11,
23          2017 which occurred at the Personnel Office and subsequent
24          correspondence from Union Attorney Susan Horwitz.
25
26          I am further investigating the dissemination of these false allegations to all
27          patrolmen in this department and to the Gloucester Daily Times Reporter

---

[15] McCarthy testified that he did not also question Williams because there was no
allegation that Williams disseminated false information.

H.O. Decision (cont'd)                                          MUP-17-6076

1    Ray Lamont.  I am ordering you to submit a report to me within forty-eight
2    (48) hours of receiving this request answering the following questions.
3
4  McCarthy listed fourteen questions.[16]  McCarthy ended his communication as
5  follows:
6
7    As this investigation may lead to violations of this Department's Rules and
8    Regulations Policies and Procedures and could result in disciplinary action
9    against you, I recommend that you consult with your Union Attorney prior to
10   submitting your report.
11
12   On July 13, 2017, Stuart responded, writing:
13
13   Since I was at the Personnel Office on May 11, 2017 in my position as
14   President of the Gloucester Police Patrolman's Association, MCOP Local
15   344, and your questions concern my activities as Union President, I have
16   been advised that it is an illegal order for you to require me to answer
17   questions about internal union issues and internal union strategy and
18   communications.
19
20  Stuart then proceeded to respond to McCarthy's questions, as follows:
21
22  1.  Did you direct the sending of a letter dated May 11, 2017 from Attorney
23      Horwitz to Ms. Donna Leete accusing Sergeant Nicastro and Lieutenant
24      Quinn of clearly listening to a private conversation in the Human Resources
25      Office?
26
27      My communications with Union Counsel are privileged communications.
28
29  2.  Detail what proof you have that this conduct in fact occurred.
30
31      I was at the Personnel Office on May 11, 2017 in my official capacity as
32      Union President and based on statements and actions of Personnel Director
33      Leete.
34
35  3.  Did you attend a 9:00 a.m. meeting on May 12, 2017 at Mayor Romeo-
36      Theken's office attended by yourself, Lieutenant Williams, Mayor Theken,
37      Human Resources Director Donna Leete, Assistant Human Resources

---

[16] The questions are laid out, along with the answers, starting on the following page.  The Complaint alleges that only questions 6, 7, 9, 10, 12, 13, and 14 are alleged to have violated the Law.

H.O. Decision (cont'd)                                         MUP-17-6076

1      Director Holly Dougwillo, Chief McCarthy, Attorney Chip Payson and Chief
2      Administration Officer James Destino, and were you paid overtime to
3      attend?
4
5      I attended a Meeting on May 12, 2017 at 9AM in my capacity as Union
6      President and I will have to check records on whether it was paid.
7
8   4. As part of this meeting, did Assistant Human Resources Director Ms.
9      Dougwillo explain that she had witnessed the event outside the Human
10     Resources Director's office and give a firsthand eyewitness account of
11     Lieutenant Quinn's and Sergeant Nicastro's actions of May 11th?
12
13     Yes, Ms. Dougwillo explained her own observations.
14
15  5. In this meeting, did Ms. Dougwillo's witnessed account of the actions of
16     Lieutenant Quinn and Sergeant Nicastro dispel any allegations that they
17     were listening to your private conversation with Human Resources Director
18     Leete?
19
20     Ms. Dougwillo explained her own observations.
21
22  6. Were you copied on an email from Human Resources Director Donna Leete
23     to Attorney Horwitz on May 12, 2017 at 12:09 p.m.?
24
25     If I am a cc then I expect I received it.  I will check my email to be sure.
26     Whatever I received was as Union President.
27
28  7. Did this email serve as a written response to the original Attorney Horwitz
29     letter from the City and did it clarify that there was no evidence supporting
30     the claim of eavesdropping or intimidation?
31
32     The email speaks for itself.
33
34  8. After the meeting at City Hall at 9:00 a.m. on May 12, 2017, and after the
35     email was sent by Human Resources Director Leete at 12:09 p.m. on May
36     12, 2017, was the Attorney Horwitz letter accusing Lieutenant Quinn and
37     Sergeant Nicastro of wrong doing and intimidation sent to all Patrolmen of
38     this Department?
39
40     It is improper to inquire about my communications as Union President with
41     Union members.
42

H.O. Decision (cont'd)                                                    MUP-17-6076

1   9. Who disseminated this letter to the Patrolmen and who directed this be
2      done?
3
4      It is improper to question me about Internal Union Communications.
5
6   10. Why did you wait four days ([from] May 12th) to share the City's Response
7       and Clarification Email from the Human Resources Director with the
8       members of this Department?
9
10      Internal Union matters are not appropriate questions.
11
12  11. Were you on duty on May 18, 2017 at 2:28 a.m.?
13
14      I believe so.
15
16  12. What was the purpose of an email sent to all Patrol Officers again alleging
17      intimidation on May 18, 2017 at 2:28 a.m.?
18
19      Any email from me as Union President is an internal Union matter.
20
21  13. Are you in any way responsible for the Attorney Horwitz letter ending up in
22      the hands of the Gloucester Daily Times Newspaper Reporter Ray Lamont?
23
24      It is improper for you to question me about my communications as Union
25      President.  But, in fact, I did not take any action to provide any documents
26      to Reporter Ray Lamont.
27
28  14. Have you given copies of the Attorney Horwitz letter or shared the contents
29      of, or made available in any way, to anyone other than your Union, the City
30      of Gloucester or the Police Department?
31
32      It is improper for you to questions me [sic] about my communications as Union
33      President.
34
35      After receiving Stuart's responses, McCarthy did not discipline Stuart. Union

36  counsel had informed McCarthy that this prohibited practice charge would be filed, and

37  McCarthy believed he was unable to take any disciplinary action against Stuart on this

38  matter until the DLR ruled on the prohibited practice charge.

14

1    **Beach Detail**

2    The Police Department assigns officers to patrol the City's public beaches.  The

3    City has historically paid overtime to officers working this detail.  In contrast, the City pays

4    officers a flat rate of $48 per hour for working on any other detail.  Overtime pay for officers

5    varies depending on the officer's highest level of education and the officer's hire date.

6    Officers who were hired in 2014 or before, and who hold an associate's degree receive

7    an additional 10% over the standard overtime rate; officers with a bachelor's degree are

8    paid an additional 20%; and officers with a master's degree receive an additional 25%.

9    Officers hired after 2014 also receive an increase in pay to reflect their higher education

10   level but receive a lower flat rate instead of the above-mentioned percentages. Therefore,

11   those officers with higher educational degrees, and especially those hired in 2014 or

12   before, receive more money when working overtime than officers without higher

13   educational degrees or those who were hired after 2014.  Consequently, the more highly

14   educated officers earn more than other officers when working the beach detail, yet all

15   officers receive the same flat rate when working on other details.

16   On August 18, 2017, Stuart submitted a written complaint to Leete and McCarthy

17   regarding improper rates of pay for the beach detail.  Stuart sought to have the City pay

18   all officers at the flat $48 hourly pay rate for working the beach detail rather than the

19   overtime rate.  Stuart understood this request would result in certain officers earning more

20   money when working the beach detail than previously, while others would earn less than

21   before. The more highly educated officers earn less when paid at the flat rate rather than

15

H.O. Decision (cont'd)                                              MUP-17-6076

1    the overtime rate.  Conversely, the more recently hired officers and those without a higher

2    degree earn more when paid at the flat rate as opposed to the overtime rate.

3          Some officers asked McCarthy about the potential change to the beach detail pay

4    rate.  When asked, McCarthy informed the officers that the change would cut the pay for

5    better-educated officers while increasing pay for less-educated officers.

6    **August 21, 2017 Discussion**

7          Patrol Officers Heidi Fialho (Fialho), Alex Aiello (Aiello) and Stephen Lamberis

8    (Lamberis) were working in the dispatch area on August 21, 2017.[17]  Fialho and Aiello

9    were both performing 911 dispatch duties and Lamberis was working as the house officer.

10         McCarthy entered into the dispatch area[18] and initiated a discussion by asking

11   what was going on with the beach detail pay.[19]  Fialho, a Union representative for the

12   Association, believed he was referring to a recently filed grievance, but she did not wish

13   to discuss the grievance in front of other members. Therefore, Fialho responded that she

---

[17] Jerome Ciolino (Ciolino) contends that he was in the dispatch area on August 21, 2017, but his recall of the day's events was not clear. I credit, instead, the corroborative testimony of Lamberis, Fialho and Aiello who all agree that Ciolino was not present for the discussion of detail rates. Further, the attendance roster for that date demonstrates that Lamberis, Fialho and Aiello were working in the dispatch area that date from 8:00 a.m. to 4:00 p.m. but reflects that Ciolino was on vacation.

[18] Both Lamberis and Fialho testified that McCarthy was sitting positioned between Fialho and Aiello with Lamberis further to Aiello's right. Aiello recalls McCarthy was standing between him and Lamberis.  Although not material to my decision, I credit Lamberis' and Fialho's consistent testimony in this regard.

[19] Although McCarthy often goes to dispatch, three or four times every day, he did not specifically recall any discussion about the beach detail while in the dispatch area on August 21, 2017.

H.O. Decision (cont'd)                                          MUP-17-6076

1    was not sure what was going on with it.[20]  She then continued with her work, answering

2    the radio and calls, and disengaged from the ensuing conversation.

3         McCarthy then spoke directly with Lamberis, saying that Stuart was trying to take

4    money out of his pockets, and other members' pockets.  Lamberis asked what he meant.

5    McCarthy responded by asking Lamberis if it wasn't the case that he had always received

6    the school incentive rate when working the beach detail. Lamberis explained that he did

7    not know because he does not track how much he gets paid for working the beach detail.

8    McCarthy then said that Stuart had sent an email to union members.  Lamberis responded

9    that he did not recall receiving it.  McCarthy replied by saying that Lamberis should check

10   because Stuart was "trying to reach into your pockets and take money away from you."

11   Aiello overheard McCarthy and Lamberis' discussion.[21]  McCarthy did not address any

12   comments to Aiello.[22]

---

[20] Neither Lamberis or Aiello recall McCarthy first having this exchange with Fialho as both recall McCarthy addressing Lamberis first when McCarthy entered dispatch. However, I credit Fialho's recall of her brief response to McCarthy before he spoke with Lamberis.

[21] Aiello corroborated Lamberis' testimony, recalling that McCarthy told Lamberis that Stuart "was going to be taking money out of his pocket…"  Fialho was aware that McCarthy and Lamberis engaged in a further conversation, but she was focused on her duties and did not specifically overhear what was said.

[22] Aiello earned less than Lamberis when they worked the beach detail because Lamberis has a higher degree and therefore merited a higher overtime rate than Aiello.  Lamberis holds a master's degree and was hired before 2014, while Aiello has a bachelor's degree and was hired after 2014.

1    Within a few hours of this conversation with McCarthy, Lamberis sought out Stuart

2    to discuss the situation.  At some point, Aiello also informed Stuart about what McCarthy

3    had said during the August 21, 2017 exchange.

4    The City and Association eventually resolved the grievance with the City agreeing

5    to adopt the $48 flat rate for all officers working the beach detail.

6    **Witness Credibility**

7    This second allegation in the complaint, which concerns McCarthy's comments to

8    bargaining unit employees regarding the Association's efforts to change the pay rate for

9    the beach detail, rests on what McCarthy said to certain officers during his visit to the

10   dispatch office on August 21, 2017. Given McCarthy's total lack of recall of his

11   conversation with the officers, and the corroborative recall of Lamberis, Aiello and Fialho

12   that McCarthy initiated a discussion about the Union's complaint concerning the beach

13   detail pay rate, I credit their testimony.  Where Lamberis, Aiello and Fialho have differing

14   recall, I credit Lamberis.[23] He had the most detailed memory of the conversation.  As

15   noted earlier, Fialho was busy with work and disengaged from the conversation after the

16   first few minutes.  Although she was aware that McCarthy and Lamberis were speaking

17   with each other, she did not hear exactly what McCarthy and Lamberis were discussing.

18   Aiello, however, overhead the exchange.  His testimony that McCarthy made a comment

19   to Lamberis to the effect that Stuart, through his grievance about the beach detail, was

---

[23] There is one exception.  As previously noted, I credit Fialho's testimony that she briefly responded to McCarthy's initial query before McCarthy conversed with Lamberis.

1   going to be taking money out of his (Lamberis') pocket, further bolsters Lamberis'
2   congruent testimony.

3       I credit Aiello's testimony to the extent it corroborates Lamberis' testimony, but I
4   do not otherwise credit Aiello's testimony due to his less comprehensive memory of the
5   events of August 21, 2017. Aiello was unable to recall Lamberis' response to McCarthy's
6   comments. Aiello also could not recall other aspects of the exchange. For instance,
7   Aiello, alone, testified that McCarthy left dispatch and then returned, but Aiello was unable
8   to recall any specifics about McCarthy's second visit to the dispatch area. Moreover, at
9   times Aiello's testimony conflicted with the recollection of other witnesses. For instance,
10  Aiello testified that McCarthy also addressed comments to Fialho, using similar words to
11  those he directed to Lamberis, to the effect that Stuart would be taking money out of her
12  pocket. I do not credit this testimony because neither McCarthy nor Fialho recall this
13  exchange. I also do not credit Aiello's recall about the positioning of the occupants in the
14  dispatch area on the day in question as it diverges from the consistent recall of Fialho
15  and Lamberis.

16      I credit Lamberis' testimony not only because he presented the most detailed recall
17  of the events of August 21, 2017, but also because the surrounding facts support his
18  account of McCarthy's comments that day. Lamberis had no knowledge of the beach
19  detail pay dispute until McCarthy first brought it to his attention. Within hours of his
20  encounter with McCarthy, Lamberis spoke with Stuart about the beach detail issue.

1   Shortly thereafter, on September 11, 2017, the Association amended the charge to add

2   the allegation regarding McCarthy's August 21, 2017 comments to Lamberis.

3          The only aspect of Lamberis' testimony that I do not credit is his stated belief that

4   McCarthy specifically sought him out and made these comments to him because

5   McCarthy wanted an historical account of the beach detail.  McCarthy credibly disputes

6   that he needed Lamberis to provide historical information as McCarthy has served with

7   the Department longer than Lamberis or any other current member and knew the history

8   of the beach detail payrate.  Lamberis' incorrect supposition as to why McCarthy directed

9   the conversation to him, however, does not taint his recollection of what was said during

10  the exchange.[24]

11         Lamberis admitted to having certain issues with McCarthy from the start of his

12  tenure, some 30 years before, when McCarthy accused him of stealing cough drops from

13  a warehouse.  This admission does not taint Lamberis' testimony.  Lamberis also had

14  issues with the Association, including having a disagreement with Stuart.  He also once

15  attended a union meeting where he "called everyone out" and spoke his mind about how

16  he was being treated by individuals in the meeting.  Given this history of difficulties with

17  both parties to this complaint, I see no impediment to crediting Lamberis' testimony about

18  the content of his exchange on August 21, 2017 with McCarthy, especially as it is

---

[24] There are other reasons that could explain why McCarthy addressed his comments to
Lamberis rather than Aiello, including the fact that Lamberis would be financially
disadvantaged by the change to a detail pay that the Association sought, while Aiello
would benefit from the change.

H.O. Decision (cont'd)                                                                MUP-17-6076

1    supported, in relevant part, by the testimony of Aiello, and Lamberis' prompt subsequent

2    discussion with Stuart on this matter.

3                                                Opinion

4         The Association alleges that the City violated Section 10(a)(1) of the Law when

5    McCarthy, on June 29, 2017, ordered Stuart to answer certain questions concerning his

6    conduct as Association President and again, on August 21, 2017, when McCarthy

7    verbally criticized Stuart's actions regarding the beach detail payrate to a bargaining unit

8    member.

9         Pursuant to Section 2 of the Law, an employee has the right to "engage in lawful,

10   concerted activities for the purpose of collective bargaining or other mutual aid or

11   protection, free from interference, restraint, or coercion." A public employer violates

12   Section 10(a)(1) of the Law when its conduct may reasonably be said to tend to interfere

13   with, restrain, or coerce employees in the free exercise of their rights under Section 2 of

14   the Law. Bristol County Sheriff's Department, 31 MLC 6, 15, MUP-2872 (July 15, 2004)

15   (citing Quincy School Committee, 27 MLC 83, 91, MUP-1986 (Dec. 29, 2000)).

16        The focus of a Section 10(a)(1) inquiry is the objective effect that the employer's

17   conduct would have on a reasonable employee. Boston School Committee, 39 MLC 366,

18   MUP-09-5543 (June 6, 2013). The subjective impact that the employer's conduct had on

19   a specific employee is not determinative of a violation. Bristol County Sheriff's

20   Department, 31 MLC at 15. Further, the employer's motivation for the conduct and

1   whether it was successful in coercing or restricting employee exercise is not considered

2   by the Commonwealth Employment Relations Board (CERB).   Id.

3   **McCarthy's Interrogation of Stuart**

4          The Association alleges that the City violated the Law when it coercively

5   interrogated Stuart about his Union activities.[25] The City argues that it did not commit an

6   unfair labor practice by investigating Stuart's involvement in disseminating the Horwitz

7   letter to the bargaining unit and his other related activities. The issue here, though, is not

8   whether it was unlawful for the City to conduct an investigation, but rather whether a

9   reasonable person would feel constrained or intimidated by McCarthy's June 29, 2017

10  questions, which, at least in part, inquired about Stuart's actions and communications as

11  Association President.

12         An employer who coercively interrogates employees about their union activities

13  violates Section 10(a)(1) of the Law. Lawrence School Committee, 33 MLC 90, 99, MUP-

14  02-3631 (December 13, 2006); Plymouth House of Correction, 4 MLC 1555, 1572, MUP-

15  2234, 2429 (December 6, 1977). Here, Stuart was interrogated about his union activity.

16  Several of McCarthy's questions pertained to Stuart's role as Association President when

17  he was acting on behalf of the bargaining unit.  For example, McCarthy asked Stuart to

18  explain who directed that Horwitz's letter be disseminated to the patrolmen; why he waited

---

[25] The Association also argues the City violated the Law by applying a different manner and method of interrogation to the Union President than other employees, but the complaint in this matter did not encompass this allegation.  Because this allegation was not fully litigated at the hearing, I decline to consider it.  See, Town of Norwell, 18 MLC 1263, MUP-6962 (January 22, 1992) (

H.O. Decision (cont'd)                                        MUP-17-6076

1  four days to share the City's response to the bargaining unit members; and what was the

2  purpose of his May 18, 2017 email to the bargaining unit.

3       The CERB has held that an interrogation that is not threatening does not constitute

4  an unfair labor practice unless it meets certain standards. Id. (citing, Bourne v. NLRB,

5  332 F.2d 47 (2nd Cir. 1964)).  In examining whether the interrogation was unlawful, the

6  CERB considers a variety of factors including: 1) whether there was a history of employer

7  hostility and discrimination; 2) the nature of the information sought, including whether the

8  interrogator appeared to be seeking information on which to base taking action against

9  individual employees; 3) the identity of the questioners, including their  position in the

10  employment hierarchy; 4) the place and method of interrogation, including whether the

11  employee was called into the supervisor's office and whether there was an atmosphere

12  of unnatural formality; and 5) the truthfulness of the reply. Lawrence School Committee,

13  33 MLC at 99.  No single factor is outcome determinative.  Rather, the CERB considered

14  the totality of the circumstances.  See, Rossmore House, 269 NLRB 1176, 1178 (1984).

15       Addressing the five factors noted above, I find that the interrogation was coercive.

16  Although the record does address hostility between the members of the Association and

17  the supervisors, the record does not address a history of employer hostility and

18  discrimination against the Association.  However, as to the second factor, it appears that

19  McCarthy was asking the questions in order to take action against Stuart.  McCarthy

20  prefaced his communication with Stuart by stating that he was investigating the

21  dissemination of "false accusations" to all patrolmen as well as a local news reporter.

H.O. Decision (cont'd)                                              MUP-17-6076

1    McCarthy concluded his communication by noting that the investigation could result in

2    disciplinary action against Stuart.[26]  Additionally, McCarthy already knew the answer to

3    certain of the questions he posed which demonstrates that he was not engaged in pure

4    fact-finding.  For instance, he asked if Stuart was copied on Leete's May 12, 2017 email

5    to Horwitz even though a quick review of the email reveals that Stuart was copied.  As to

6    the third factor, McCarthy is the Chief of the Police Department. Therefore, the very

7    highest official of the Police Department ordered Stuart to answer the questions.  As to

8    the fourth factor, although Stuart was permitted to answer the questions in writing, and

9    therefore the location and method of the interrogation was not necessarily coercive, the

10   atmosphere was clearly formal as Stuart was ordered to answer the questions subject to

11   discipline. The fifth factor regards the truthfulness of the responses.  There is no evidence

12   that Stuart's responses were untruthful, although several of his responses were limited to

13   his declaration that it was improper for McCarthy to inquire about his communications as

14   Association President and other internal Union matters.    Given the totality of the

15   circumstances, after considering the five factors addressed above, I find that McCarthy's

16   June 29, 2017 questions were coercive.

17          The City argues that Stuart lost the protection of the Law by knowingly telling lies

18   about Nicastro and Quinn.  Concerted activity can lose its protected status if it is unlawful,

---

[26] The fact that McCarthy did not ultimately discipline Stuart for his actions in distributing the Horwitz letter is immaterial.  See City of Lawrence, 15 MLC 1162, 1167, MUP-6086 (September 13, 1988).

H.O. Decision (cont'd)                                           MUP-17-6076

1   violent, in breach of contract in certain circumstances, disruptive, or indefensibly disloyal

2   to the employer. City of Haverhill, 8 MLC 1690, 1694, MUP-4202 (December 16, 1981).

3            The City asserts that Stuart knowingly issued Horwitz's letter to the bargaining unit

4   after learning in the May 12, 2017 meeting that the allegations in the letter were false,

5   thereby defaming Nicastro and Quinn.  I disagree.  The City acknowledges that where

6   statements are made in the course of a labor dispute, as here, the applicable legal

7   standard for defamation is actual malice. Executive Board of Local 403, International

8   Brotherhood of Police Officers v. Barrett, 1998 Mass. Super. LEXIS 548, 9 Mass. L. Rep.

9   212 (1998), citing New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). Additionally,

10  the actual malice standard applies to police officers, who are considered public officials

11  for the purpose of defamation claims.  Rotkiewicz v. Sadowsky, 431 Mass. 748, 752

12  (2000).  Actual malice is proved by a showing that the defamatory falsehood was

13  published with knowledge that it was false or with reckless disregard of whether it was

14  false.  To prove "reckless disregard" there must be "sufficient evidence to permit the

15  conclusion that the defendant in fact entertained serious doubts as to the truth of his

16  publication." St. Amant v. Thompson, 390 U.S. 727, 731, (1968).

17           Horwitz wrote in her letter that Stuart had disseminated to the bargaining unit,

18  "[w]hile President Stuart was in your office with the door closed so that he could express

19  the Union's concerns to you in privacy, you and he heard Sergeant Nicastro and

20  Lieutenant Quinn directly outside your door, clearly listening to your discussion.  Soon

21  after you opened the door, they walked away and left." There can be no doubt that, apart

H.O. Decision (cont'd)                                          MUP-17-6076

1    from "clearly listening to your discussion," these were truthful statements. The City

2    maintains that Stuart knew when he directed Balbo to send Horwitz's letter to the

3    bargaining unit that Nicastro and Quinn were not "clearly listening," however, the evidence

4    does not support this contention.   Although others may have left the May 12, 2017

5    meeting convinced that no evidence supported the accusation that Nicastro and Quinn

6    were eavesdropping on Stuart's meeting with Leete, Stuart remained unconvinced.  While

7    Stuart admits that Dougwillo is credible, and she did not see Nicastro and Quinn pause

8    for long outside Leete's closed door, Stuart knew that Nicastro and Quinn were right

9    outside the door, and he knew they were there long enough for him to hear their radios.

10    Given what Stuart personally saw and heard on May 11, 2017, he believed the two

11    superior officers were listening to his discussion with Leete.

12        Horwitz's letter also expressed that Quinn and Nicastro intended to interfere with

13    Stuart's Union activity and intimidate him and his members. These comments, though,

14    were merely expressing the Association's opinion or conclusion based on the above

15    referenced facts. An "expression of opinion based on disclosed or assumed

16    nondefamatory facts is not itself sufficient for an action of defamation, no matter how

17    unjustified and unreasonable the opinion may be or how derogatory it is." National

18    Association of Government Employees, Inc. v. Central Broadcasting Corporation, 379

19    Mass 220, 227-228 (1979). Accordingly, the evidence does not support a finding that

20    Stuart acted with actual malice when he directed Balbo to distribute Horwitz's letter to the

21    bargaining unit, and Stuart's actions, therefore, remained protected.

1    The City further argues that Stuart's actions lost their protection because his

2    actions demeaned two superior officers and disrupted the employer's business.  In City

3    of Boston, 6 MLC 1096, MUP-2878 (May 23, 1979), the CERB explained:

4        The fact that speech takes place within the context of protected activities
5        does not preclude an inquiry into the nature of the statements made.
6        Instead, a balance must be struck in each case between the rights of
7        employees to engage in concerted activities and the rights of employers not
8        to be subjected to egregious, insubordinate, or profane remarks which
9        disrupt the employer's business or demean workers or supervisors.
10
11   The City maintains that Stuart disrupted his employer's business when he

12   distributed Horwitz's letter to the bargaining unit, noting that, as a result, one of the

13   superior officers had a strong emotional reaction at home, while the other "flubbed" an

14   interview.   Although there is no doubt that Nicastro and Quinn were hurt and even

15   distraught by the allegations against them that were disseminated to all officers in the

16   Association's bargaining unit, the record does not contain evidence of material disruptions

17   of the Police Department's operation based on Stuart's actions in this matter.

18   In support of its contention that Stuart's actions lost their protection because he

19   demeaned Quinn and Nicastro with his allegations that they eavesdropped on his

20   conversation with Leete, the City points to Plymouth Police Brotherhood v. Labor

21   Relations Commission, 417 Mass. 436 (1994).  In that case, the Supreme Judicial Court

22   determined that the employer justifiably disciplined a union leader for emailing bargaining

23   unit members that the town's negotiating team consisted of "pigs, cheats, liars,

24   whatever!!!!"  I find the facts here are distinguishable from those in Plymouth Police

25   Brotherhood.  Stuart was not making gratuitous insults, he was explaining what took place

1   based on his own perceptions. I find the facts here to be more analogous to the facts in

2   City of Lawrence, 15 MLC 1162.  In City of Lawrence, the Union President issued a letter

3   to unit members complaining of the Chief's attitude, lying, failure to honor contracts, union

4   busting tactics, absence in time of need, and inability to motivate those under his

5   command. The employees were asked to participate in a no-confidence vote.  Significant

6   portions of the letter were printed in a local newspaper. The Chief, considering the letter

7   libelous, ordered an administrative inquiry questioning members of the Executive Board,

8   in part, about the drafting of the letter and the specific incidents underlying the complaints.

9   The CERB determined that the President's letter, albeit "sharply worded", was protected

10  and therefore the Chief violated the Law by ordering the administrative inquiry. Id. at

11  1166-1167. Stuart's stated belief that Nicastro and Quinn were eavesdropping, as

12  portrayed in Horwitz's letter, cannot be deemed more disparaging or disruptive than the

13  comments and no-confidence vote described in City of Lawrence.  Here, as in City of

14  Lawrence, Stuart's actions remained protected, and the interrogation regarding the

15  protected action interfered with, restrained, and coerced employees in the exercise of

16  their rights in violation of Section 10(a)(l) of the Law.

17  **McCarthy's August 21, 2017 Comments Regarding Beach Details**

18      Stuart was also engaged in protected activity when he, as Association President,

19  submitted a grievance to Leete and McCarthy regarding a condition of employment,

20  specifically the pay rate for the beach detail. See Suffolk County Sheriff's Department,

21  27 MLC 155, MUP-1498 (June 4, 2001). On August 21, 2017, McCarthy commented on

28

H.O. Decision (cont'd)

MUP-17-6076

1  this protected activity when he informed Lamberis that Stuart was trying to take money

2  out of his pocket. The Association maintains that the City violated Section 10(a)(1) of the

3  Law when McCarthy made this critical and disparaging remark to a bargaining unit

4  employee. The City asserts that McCarthy's comments did not run afoul of Section

5  10(a)(1). I agree with the Association that McCarthy's comments did run afoul of Section

6  10(a)(1).

7       The City suggests that McCarthy was merely answering questions and/or

8  expressing his opinion during the August 21, 2017 exchange with Lamberis, noting that

9  a public employer is free to make its position with respect to collective bargaining issues

10  known to employees. I am not persuaded by this argument. Here, McCarthy went beyond

11  merely discussing the City's position on a collective bargaining matter. He initiated a

12  discussion with a bargaining unit employee to ensure that the employee was aware of the

13  Association's actions and that those actions would financially harm him.  McCarthy

14  characterized Stuart's actions by telling Lamberis that the Association President was

15  "trying to reach into your pockets and take money away from you." McCarthy's comments

16  were clearly critical of Stuart's position regarding the beach detail pay rate. When conduct

17  is protected by Law, as here, an employer has no right to interfere with it and the

18  "expression of employer anger, criticism or ridicule directed to an employee's protected

19  activity has been recognized to constitute interference, restraint and/or coercion of

20  employees." Boston School Committee, 39 MLC 366, 370, MUP-09-5543 (citing Groton-

H.O. Decision (cont'd)

MUP-17-6076

1  Dunstable Regional School Committee, 15 MLC 1551, 1557, MUP-6748 (March 20,

2  1989)).

3        The City further argues that because McCarthy issued no threats and promised

4  no benefits, his statement did not violate the Law. I do not find any merit to this argument

5  because comments have been found to violate the Law even without an overt threat or

6  promise of benefits. The CERB has determined that disparaging remarks directed to an

7  employee's protected activity, even without direct threats of adverse consequences, are

8  unlawful if the remarks tend to reasonably interfere with employees in the exercise of their

9  Section 2 rights. Athol-Royalston Regional School District, 26 MLC 55, 56, MUP-1832

10  (November 2, 1999). For example, the CERB determined that a Superintendent, who

11  stated to a grievant "You act like a little boy...a cry baby...you seem to appear victimized

12  by me and the Committee...you are taking money out of the budget for your grievances

13  (and it) could be spent for kids in the district[ ]"  ridiculed and belittled the employee's

14  grievance activities, and such comments could reasonably chill employees from engaging

15  in protected conduct. Groton-Dunstable Regional School Committee, 19 MLC 1194,

16  1195, MUP-7995) (August 17, 1992). Similarly, here, McCarthy made derogatory

17  comments towards Stuart's protected activity when he informed a bargaining unit

18  employee that Stuart, as Association President, was trying to take money out of his

19  pocket. McCarthy directed this comment to Lamberis, who would be financially

20  disadvantaged by Stuart's actions. McCarthy did not address the comments to Aiello,

21  who was also in dispatch at the time, who would financially benefit from Stuart's actions.

H.O. Decision (cont'd)                                MUP-17-6076

1    McCarthy then encouraged Lamberis to "check" Stuart's email on this issue. Within hours

2    of this conversation, Lamberis checked with Stuart about the beach detail pay rate issue,

3    which may well have been McCarthy's intent. Regardless of his intent, however, the

4    comments McCarthy directed to Lamberis about Stuart's protected activity would tend to

5    interfere, restrain, or coerce an employee in the exercise of their rights.

6         Lastly, the City argues that no employee suffered as a result of McCarthy's

7    statements, noting that the City eventually granted the Association's grievance and

8    changed the beach detail pay rate as desired by the Association. The fact that the City

9    ultimately adopted the Associations' position regarding the beach detail pay rate is

10   irrelevant. The CERB does not consider whether the coercion succeeded or failed. Bristol

11   County Sheriff's Department, 31 MLC at 15 (citing Groton-Dunstable Regional School

12   Committee, 15 MLC at 1556). McCarthy's comments need not actually coerce or restrain

13   an employee in the exercise of Section 2 rights to constitute a violation of the Law. A

14   violation will be found where, as here, a comment could reasonably be said to interfere

15   with, restrain, or coerce employees in the exercise of their rights under Section 2 of the

16   Law.

Conclusion

17        Based on the record and for the reasons explained above, I find that the City

18   violated Section 10(a)(1) of the Law when it ordered Stuart to answer certain questions

19   on June 29, 2017, pertaining to actions he took as the Association President, and when

H.O. Decision (cont'd)                                          MUP-17-6076

1   McCarthy, on August 21, 2017, disparaged the Association's protected activity regarding

2   the beach detail to a bargaining unit employee.

3                                          Order

4        WHEREFORE, based upon the foregoing, IT IS HEREBY ORDERED that the City

5   shall:

6   1. Cease and desist from:

7            a. Making statements that would tend to interfere, restrain or coerce
8               employees in their exercise of their rights guaranteed under Section 2
9               of the Law.
10
11           b. Interfering, restraining or coercing employees in the exercise of their
12              rights under the Law by unlawfully interrogating them regarding activities
13              protected under Section 2 of the Law.
14
15           c. In any like manner, interfering with, restraining or coercing its employees
16              in the exercise of any right guaranteed under the Law.
17
18
19   2. Take the following affirmative action that will effectuate the purposes of the Law:

20           a. Immediately post signed copies of the attached Notice to Employees in
21              all conspicuous places where members of the bargaining unit usually
22              congregate and where notices to these employees are usually posted,
23              including electronically if the City customarily communicates to its
24              employees via intranet or email, and maintain for a period of thirty (30)
25              consecutive days thereafter; and
26
27           b. Notify the DLR in writing of the steps taken to comply with this decision
28              within ten days of receipt of the decision.

     SO ORDERED.

H.O. Decision (cont'd)                                    MUP-17-6076

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF LABOR RELATIONS


_Kerry Bonner_

KERRY BONNER

APPEAL RIGHTS

The parties are advised of their right, pursuant to M.G.L. c. 150E, Section 11, 456 CMR 13.19, to request a review of this decision by the Commonwealth Employment Relations Board by filing a Notice of Appeal with the Executive Secretary of the Department of Labor Relations not later than ten days after receiving notice of this decision.  If a Notice of Appeal is not filed within the ten days, this decision shall become final and binding on the parties.



THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF LABOR RELATIONS

# NOTICE TO EMPLOYEES

## POSTED BY ORDER OF A HEARING OFFICER OF THE MASSACHUSETTS DEPARTMENT OF LABOR RELATIONS
### AN AGENCY OF THE COMMONWEALTH OF MASSACHUSETTS

A hearing officer of the Massachusetts Department of Labor Relations has held that the City of Gloucester has violated Section 10(a)(1) of Massachusetts General Laws, Chapter 150E by interrogating the Association President regarding activities protected under Section 2 of the Law and by making statements that would tend to interfere, restrain and coerce employees in the exercise of their rights guaranteed under Section 2 of the Law.

The City of Gloucester posts this Notice to Employees in compliance with the hearing officer's order.

Section 2 of M.G.L. Chapter 150E gives public employees the following rights:
      to engage in self-organization; to form, join or assist any union;
      to bargain collectively through representatives of their own choosing;
      to act together for the purpose of collective bargaining or other mutual aid or protection; and
      to refrain from all of the above.

WE WILL NOT make statements that would tend to interfere, restrain or coerce employees in the exercise of their rights guaranteed under Section 2 of the Law.

WE WILL NOT interrogate employees regarding activities protected under Section 2 of the Law.

WE WILL NOT otherwise interfere with, restrain or coerce employees in the exercise of their rights guaranteed under the Law.

---------------------------------------                    ---------------------------
CITY OF GLOUCESTER                                          DATE

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED OR REMOVED**

This notice must remain posted for 30 consecutive days from the date of posting and must not be altered, defaced, or covered by any other material.  Any questions concerning this notice or compliance with its provisions may be directed to the Department of Labor Relations, Charles F. Hurley Building, 1st Floor, 19 Staniford Street, Boston, MA 02114 (Telephone: (617) 626-7132).