APD MANAGEMENT

# GLOUCESTER
# POLICE DEPARTMENT

## INVESTIGATIVE REPORT

**Dated: February _____, 2018**


**In the matter of:**

**Lieutenant Jeremiah Nicastro**

**Regarding Incident of 12/02/17**

## Table of Contents

I    INVESTIGATIVE DIRECTIVE ................................................................................................ 4

II    SCOPE OF INVESTIGATION ............................................................................................. 4

III    BACKGROUND INFORMATION ........................................................................................ 4

IV    ALLEGATIONS, FINDINGS AND DISCUSSION ............................................................... 7

Allegation #1 ........................................................................................................................ 7

Allegation # 2 ...................................................................................................................... 7

V    CONCLUSION .................................................................................................................. 16

Conclusion #1 | Insufficient Evidence ............................................................................... 16

Conclusion #2 | Rules Violated ........................................................................................... 18

## LIST OF EXHIBITS

1.    Arrest report of Officer Christopher Liacos for GLO Incident 17GLO-23393-AR

2.    Transcribed Interview of Officer Christopher Liacos Conducted on January 24th, 2018

3.    Transcribed Interview of Lieutenant Jeremiah Nicastro Conducted on January 29th, 2018

4.    Transcribed Interview of Sergeant Ciolino conducted on February 6th, 2018

# NOTICE AND WARNING

THE CONTENTS OF THIS REPORT MAY CONTAIN PERSONALLY INDENTIFIABLE INFORMATION INCLUDING POTENTIAL CRIMINAL OFFENDER RECORD INFORMATION.

THE CONTENTS OF THIS REPORT MAY CONTAIN SENSITIVE INFORMATION REGARDING SECURITY ISSUES.

THE CONTENTS OF THIS REPORT MAY CONTAIN UNCORROBORATED OR UNSUSTAINED ALLEGATIONS OF MISCONDUCT BY TOWN EMPLOYEES OR CIVILIANS.

THE CONTENTS OF THIS REPORT MAY CONTAIN PERSONNEL FILE INFORMATION.

THIS REPORT, OR PORTIONS THEREOF, MAY NOT BE A PUBLIC RECORD.

PLEASE CONSULT WITH TOWN COUNSEL PRIOR TO ANY INTERNAL OR EXTERNAL DISSEMINATION OF THIS REPORT OR EXHIBITS.

———————————

This report contains confidential and sensitive material which should be redacted before distribution outside of the scope of the Appointing Authority and the Police Department.

The material which must be reviewed and redacted includes the report and exhibits and includes the names of any juveniles, addresses, dates of births when appropriate, social security numbers or any other information which should not be disclosed publicly.

It is the responsibility of the City of Gloucester to ensure that this material is properly redacted before distributing copies.

I    **INVESTIGATIVE DIRECTIVE**

The undersigned, Alfred P. Donovan, hereinafter referred to as the "Investigator", has been directed by Gloucester City Solicitor, Charles J. Payson, to conduct an investigation into a verbal complaint submitted by Gloucester Police Officer Christopher Liacos with the support of the Patrolman's Union regarding allegations that his Supervisor/Watch Commander, Lieutenant Jeremiah Nicastro, changed his arrest report regarding an incident which resulted in the arrest of one Euner Martin on December 2, 2017 at 52 Taylor Street in Gloucester. It is alleged the changes made by Lieutenant Nicastro were improper and inaccurate.

II    **SCOPE OF INVESTIGATION**

The scope of this Investigation is to (a) review the attached Exhibits, related material, laws, policies, procedures, rules and regulations (b) conduct interviews deemed necessary and (c) employ any additional investigative efforts needed to make a determination as to what, if any, act, omission or other conduct perpetrated by Lieutenant Nicastro as alleged by Officer Liacos and the Union or otherwise brought forth through the investigative process, violated any of the Gloucester Police Department's Policies, Procedures, Rules or Regulations or statutory laws of the Commonwealth of Massachusetts.

III    **BACKGROUND INFORMATION**

On December 2, 2017, at approximately 3:23 am, the Gloucester Police Department responded to a call for service at 52 Taylor Street for a complaint of an assault.  Officer Christopher Liacos and Officer Leon Stuart were the first responding officers.  Sergeant Jerome Ciolino and Lieutenant Jeremiah Nicastro arrived on the scene shortly thereafter.  Officer Christopher Liacos was the Reporting Officer and wrote the arrest report regarding the incident

4

(see attached "Arrest report of Officer Christopher Liacos for GLO Incident 17GLO-23393-AR" marked as **Exhibit #1**). The incident involved two unrelated Spanish speaking families (the Lopez's and the Martin's) who lived in the same apartment at 52 Taylor Street.

Upon arrival Officer Liacos reported that he spoke with Kelvin Lopez who was the complaining party. Kelvin Lopez informed Officer Liacos that his wife, Yesenia Lopez, and their seven year old daughter were asleep in their bedroom when they were awakened to find their roommate, Euner Martin, pulling their blankets off while they were in bed. Kelvin reported that Euner was standing in their bedroom in his underwear with his phone in his hand and told Yesenia, *"Be quiet and don't say anything"*. Kelvin reported that his wife stated that Martin then quickly went into the bathroom. Officer Liacos reported that he ultimately arrested Euner Martin and transported him back to the station.

An important issue which impacted this incident and the events which led to this investigation is the fact that Kelvin Lopez, Yesenia Lopez and Euner Martin are Spanish speaking and understand or speak very little English. Kelvin Lopez understands some English and has a workable English vocabulary but does not speak English fluently. Yesenia Lopez appears to understand some English but has a very limited English vocabulary. Euner Martin indicated he spoke only Spanish when Officer Liacos attempted to talk to him at the scene of the incident. None of the officers on the scene were fluent in Spanish.

Officer Christopher Liacos was interviewed by this Investigator on January 24, 2018 at the Gloucester City Hall. The interview was recorded and transcribed (see attached "Transcribed Interview of Officer Christopher Liacos Conducted on January 24th, 2018" marked as **Exhibit #2**). Officer Liacos was a reluctant witness and indicated he did not feel comfortable reporting against another Gloucester Police Officer.

5

Officer Liacos reported he was told Yesenia Lopez woke up to find Euner Martin in her bedroom. He reported he had spoken to Yesenia Lopez on the morning in question and she told him she witnessed Euner Martin pulling her bedcovers down. She noticed her daughter's nightgown was pulled up but she had not seen Martin touch her daughter's nightgown. She did not know how her daughter's nightgown was lifted.

Officer Liacos reported that one line in his report had been changed by Lieutenant Nicastro. Specifically, he indicated Lieutenant Nicastro added the following critical fact to his report:

> "Yesenia was awoken unexpectedly to their roommate Euner Martin pulling down the blankets off her daughter and touching her daughters abdomen while pushing up [the daughter's] night gown." [emphasis added]

Officer Liacos reported that Lieutenant Nicastro told him he was going to change his report and Officer Liacos did not object because Nicastro was a Lieutenant. The fact that Lieutenant Nicastro told Officer Liacos beforehand that he planned to change the report and advised Officer Liacos of the precise change he intended to make is somewhat enlightening. Although certainly not determinative, it does speak to Lieutenant Nicastro's state of mind at the time to some extent and may be helpful when determining whether or not adding these facts was reasonable, negligent or criminally actionable. Lieutenant Nicastro did not, for example, furtively add the statement without the consent of Officer Liacos. On the other hand, the disparity in rank between Lieutenant Nicastro and Officer Liacos cannot be ignored as it is unlikely Lieutenant Nicastro anticipated resistance to his suggestion from Officer Liacos.

## IV    ALLEGATIONS, FINDINGS AND DISCUSSION

### Allegation #1

That Lieutenant Jeremiah Nicastro misrepresented the facts that were told to him by Yesenia Lopez with regard to whether Euner Martin lifted the nightgown of Yesenia Lopez's daughter on the morning of December 2, 2018.

Stated plainly: Was the reporting as fact by Lieutenant Nicastro that Euner Martin *lifted the nightgown* of Yesenia Lopez's daughter a deliberate misrepresentation of the testimony of Mrs. Lopez or was it a legitimate miscommunication resulting from the challenges presented by the English/Spanish language barrier and other factors at the scene?

### Allegation # 2

That Lieutenant Jeremiah Nicastro intentionally manufactured evidence/facts regarding the statement: "Yesenia was awoken unexpectedly to their roommate Euner Martin pulling down the blankets off her daughter and touching her daughters abdomen while pushing up [the daughter's] night gown." which Lieutenant Nicastro admittedly added to Officer Liacos' report after he changed the charges lodged against Euner Martin from Domestic Assault & Battery to the more serious charge of Indecent Assault & Battery. [emphasis added]

Stated plainly: Did Lieutenant Nicastro, in his zeal to charge Euner Martin with a heinous crime, fabricate a required element of that crime?

———————

Lieutenant Jeremiah Nicastro was interviewed by this Investigator on January 29, 2018 at the Gloucester Police Department.    The interview was recorded and transcribed (see attached

"Transcribed Interview of Lieutenant Jeremiah Nicastro Conducted on January 29th, 2018" marked as **Exhibit**

**#3**). During such interview Lieutenant Nicastro related the following facts:

i)     That on the morning in question he was on a ride along with Sergeant Ciolinio when the call came in.   He reported that when he arrived at the scene he sent Sergeant Ciolinio up to the apartment and that Sergeant Ciolinio later requested his presence inside.

ii)    He reported that when he first entered the apartment that Officer Liacos expressed to him that, *"This guy needs to go one way or another."*

iii)   He indicated he spoke to the suspect (Euner Martin) and he was not answering his questions so he went and spoke with Mrs. Lopez.

iv)    He further stated that Mrs. Lopez reported the following to him:

NICASTRO:     ...WITH, UH, I BELIEVE CIOLINO WAS WITH ME[1]. I SAID, "CAN YOU JUST EXPLAIN TO ME WHAT HAPPENED?" SHE SAID, "I WAS IN BED. I WOKE UP. HE WAS STANDING OVER MY DAUGHTER LIFTING HER PAJAMA TOP OFF[2]. AND I SAID, 'WHAT ARE YOU DOING?' AND HE SAID, 'SHH, DON'T DO ANYTHING.' AND I CALLED 9-1-1." SO AT THAT POINT, WE WERE PLACING HIM UNDER ARREST FOR DOMESTIC ASSAULT AND BATTERY.

v)     That Euner Martin was originally arrested for Domestic Assault & Battery and after reviewing legal materials he was later charged with Indecent Assault & Battery.   That conversation went as follows:

NICASTRO:     SO WE ARREST HIM FOR DOMESTIC ASSAULT AND BATTERY FOR...

DONOVAN:      YUP.

NICASTRO:     ...TRYING TO TAKE THE PAJAMA TOP OFF.

---

[1] As provided later in this report, Sergeant Ciolino's recollection of this event is that he was straddling the bedroom and living room doorway when this conversation occurred and he did not hear either Lieutenant Nicastro's questions nor Yesenia Lopez's responses.

[2] Note: Lieutenant Nicastro's statement regarding Mrs. Lopez indicating she observed Euner Martin "lifting her pajama top off" must be read in the context of which it was heard by Lieutenant Nicastro as explained in **Conclusion #1** later in this report.

8

| DONOVAN: | YEAH. |
|---|---|
| NICASTRO: | WE COME TO THE...I SEIZE THE, I SEIZE THE CELL PHONE. WE COME TO THE POLICE STATION. I'M BOOKING HIM. I SAID TO SERGEANT CIOLINO, I SAID, "GO OUTSIDE. CALL LIEUTENANT FITZGERALD WHO'S IN CHARGE OF DETECTIVES. LET HIM KNOW WHAT'S GOING ON, AND LET HIM KNOW WE MAY HAVE A POSSIBLE SEXUAL ASSAULT. WE DON'T KNOW WHAT WE HAVE HERE. BUT RIGHT NOW, IT'S JUST A DOMESTIC." HE GOES OUT AND MAKES THE PHONE CALL. I CONTINUE THE BOOKING. SERGEANT CIOLINO COMES BACK, AND HE SAYS...I SAID TO HIM, "THERE'S GOT TO BE SOMETHING MORE THAN DOMESTIC HERE." SO HE GOES UP, AND HE GRABS THE CRIMINAL LAW BOOK. AND WE GO THROUGH CASE LAW AND STUFF, AND <u>WE FIND OUT RUBBING OF THE ABDOMEN IS CONSIDERED INDECENT ASSAULT AND BATTERY</u>. [EMPHASIS ADDED] |
| DONOVAN: | RIGHT. |
| NICASTRO: | SO WE CHANGED THE CHARGE. AND THIS IS MY ERROR. WE SHOULD HAVE KEPT DOMESTIC ON THERE... |
| DONOVAN: | YUP. |
| NICASTRO: | ...AND ADDED THE INDECENT. |

As a follow up to how the Domestic Assault & Battery charge was changed to Indecent Assault and Battery, I asked Lieutenant Nicastro where the statement that Euner Martin "was rubbing the child's abdomen" or stomach came from. Lieutenant Nicastro responded as follows:

| DONOVAN: | WHERE DID THAT STATEMENT THOUGH WHERE SHE WAS, HE WAS RUBBING HER ABDOM-, STOMACH COME FROM? |
|---|---|
| NICASTRO: | WE DISCUSSED THAT AFTERWARDS UPSTAIRS. UH, LET ME JUST... |
| DONOVAN: | OKAY. GO AHEAD. |
| NICASTRO: | LET ME, LET ME, LET ME CONTINUE. SO ON THE WAY BACK TO THE STATION, OBVIOUSLY, [CIOLINO] AND I ARE TALKING ABOUT, YOU KNOW, WHAT TO CHARGE HIM WITH. AND, WELL, LIKE, <u>IF HE IS LIFTING UP THE GIRL'S PAJAMAS, HE HAD TO HAVE TOUCHED HER ABDOMEN</u>. AND THAT'S WHAT WE WERE TRYING TO THINK. IS THAT INDECENT ASSAULT AND BATTERY? <u>'CAUSE IT'S IMPOSSIBLE TO TAKE SOMEBODY'S SHIRT OFF WITHOUT ACTUALLY TOUCHING THEM</u>. [EMPHASIS ADDED] |

DONOVAN:        OKAY

NICASTRO:       SO THAT'S WHERE THAT CAME FROM.  SO HE GETS BACK.  HE GOES, LOOKS UP CASE LAW, FINDS OUT TOUCHING THE ABDOMEN IS.  'CAUSE THAT'S WHAT THE MOTHER TOLD ME.

DONOVAN:        OKAY.

NICASTRO:       UM, SO AFTER BOOKING THIS, HE HAS HIS CELL PHONE.  I SEIZE IT.  THE CELL PHONE IS PASS CODE PROTECTED.  I SAID, "CAN YOU PROVIDE ME THE PASS CODE SO I CAN GO THROUGH YOUR CELL PHONE?"  HE PROVIDES ME THE PASS CODE.  THAT'S CONSENT.

DONOVAN:        OKAY.

NICASTRO:       GO THROUGH THE CELL PHONE.  IT'S NOT A PHONE THAT I'M FAMILIAR WITH, CAN'T FIGURE IT OUT.  BRING THE CELL PHONE UPSTAIRS.  AFTER THE BOOKING, CIOLINO GOES THROUGH IT QUICKLY.  HE SAYS, "YOU KNOW WHAT?"  HE SAYS, "FITZGERALD SAID, 'SEIZE THE CELL PHONE.  DON'T GO THROUGH IT.'"  I SAYS, "WE HAVE CONSENT ANYWAY. HE GAVE ME THE PASS CODE."  WENT THROUGH IT QUICKLY.  NO STUFF IN THERE.

DONOVAN:        OKAY.

NICASTRO:       I DON'T KNOW IF THE WIFE CAN DELETE IT FROM IT, FROM HER COMPUTER AT HOME.  I DON'T KNOW WHAT WE HAVE.

DONOVAN:        RIGHT.

NICASTRO:       SO ALL I KNOW IS, AT THAT TIME, WE HAD PC FOR DOMESTIC ARREST.  I SHOULD HAVE K-, KEPT THE DOMESTIC ARREST AND ADDED THE INDECENT ASSAULT AND BATTERY.

DONOVAN:        OKAY.

NICASTRO:       CHRIS WRITES THE REPORT.  THERE'S NOTHING THERE AS FAR AS TOUCHING THE ABDOMEN.

DONOVAN:        OKAY.

NICASTRO:       I RECEIVED THAT STATEMENT FROM HER AS WELL CHRIS.  SO I GO IN.  I REVIEWED HIS REPORT, BECAUSE I WAS THERE.  **I GO IN AND ADD IN THE REPORT, "TOUCHING HER DAUGHTER'S ABDOMEN..."** [EMPHASIS ADDED]

DONOVAN:        OKAY.  YUP.

NICASTRO:       ...FOR THE INDECENT ASSAULT AND BATTERY.

DONOVAN:        YUP

NICASTRO:  I CALL CHRIS INTO MY OFFICE, WATCHMEN'S OFFICE.

DONOVAN:  CHRIS WHO?

NICASTRO:  LIACOS.

DONOVAN:  OKAY. YUP.

NICASTRO:  CALL CHRIS INTO MY OFFICE, LIACOS. I SAID, "CHRIS, I READ YOUR REPORT. I MADE THIS CHANGE." SERGEANT CIOLINO IS WITH ME. I SAID, "I MADE THIS CHANGE. I WANT YOU TO READ IT AND LET ME KNOW IF YOU'RE OKAY WITH IT. 'CAUSE THIS IS WHAT SHE TOLD ME." HE READS THE REPORT. HE GOES, "YUP. THAT'S WHAT SHE TOLD ME. I'M FINE WITH IT." WE SUBMITTED THE REPORT.

DONOVAN:  OKAY.

NICASTRO:  THAT WAS IT.

DONOVAN:  OUR UNDERSTANDING IS THAT'S NOT WHAT HE IS SAYING NOW. OKAY?

NICASTRO:  HE IS LYING THEN.

DONOVAN:  I'M NOT...I'M JUST, UH, I'M GONNA GO BACK AND REVIEW HIS TESTIMONY. BUT THAT WASN'T MY RECOLLECTION OF WHAT HE SAID. UH, AND HE, MY RECOLLECTION...AND I'M JUST, I'M...

NICASTRO:  YUP.

DONOVAN:  I GOT NOTHING TO HIDE HERE. I'M NOT TRYING TO...

NICASTRO:  NO. I KNOW.

DONOVAN:  I JUST WANT YOU TO KNOW THAT THAT'S, THAT'S A ISSUE THAT'S A PROBLEM. AND I WANT TO GO BACK AND REVIEW HIS TESTIMONY, BECAUSE HE WAS, AT BEST, A RELUCTANT WITNESS. OKAY? HE DIDN'T WANT TO BE THERE...I CAN TELL YOU THAT...FROM THE BEGINNING. OKAY? UM, OKAY.

In sum, Lieutenant Nicastro made it clear he interviewed Yesenia Lopez and she told him she witnessed Euner Martin lift up her daughter's nightgown on the morning of December 2, 2017. From that assertion Lieutenant Nicastro indicated he and Sergeant Ciolino researched the elements and relevant case law regarding the crime of Indecent Assault & Battery and

determined that it would have been impossible for Euner Martin to lift up Yesenia Lopez's daughter's nightgown without touching her stomach/abdomen in the process.

Lieutenant Nicastro's decision to revise the charges against Euner Martin and the thought process behind the change are critical to making a determination whether or not the actions of Lieutenant Nicastro were based upon: (i) an intentional and deceptive misrepresentation of the facts, (ii) a careless exaggeration of the facts, (iii) flawed logic and unreasonable deduction or (iv) a reasonable presumption based on available evidence.

Interviews were conducted with Sergeant Jerome Ciolinio on January 29, 2018 and again on February 6, 2018.  During his interviews, Sergeant Ciolinio confirmed the following facts as asserted by Lieutenant Nicastro: (See attached transcribed interview conducted on February 6th, 2018 marked exhibit #4)

  i)    He confirmed that Officer Liacos told them that *"This guy needs to go one way or another"* when they first entered the apartment.   He also reported that he does not recall the exact conversations that were held during the call as the event happened several weeks ago.

  ii)   He confirmed that Lieutenant Nicastro interviewed Yesenia Lopez and that her English was adequate enough to get what they needed to get.   Sgt. Ciolino reported that he was not in a position to hear the exact conversation between Lt. Nicastro and Yesinia Lopez.

  iii)  He confirmed that after returning to the Police Station with the prisoner in custody they went to the law books to look up charges and case law.

During my interview of Officer Liacos he reported he spoke to Yesenia Lopez at the scene and she told him she witnessed Euner Martin pulling down the covers and that her daughter's nightgown was pulled up.  However, she also stated that *she did not witness* Euner

Martin touch her daughter's nightgown and *she did not know* how the nightgown had been pulled up. This discrepancy in reported facts between Officer Liacos and Lieutenant Nicastro is the most critical component of this investigation as the change Lieutenant Nicastro made to Officer Liacos' report concerns this disputed fact and from it came the premise that pulling up the nightgown would have led to a touching of the child's stomach/abdomen.

Officer Liacos made the following statement concerning what Yesenia Lopez told him about the covers being pulled down and the nightgown of her daughter:

| | |
|---|---|
| DONOVAN: | Y-, YOU KNOW. UM, ALL RIGHT. OKAY. NOTHING ELSE YOU CAN ADD THAT I HAVEN'T ASKED YOU ABOUT, THAT…? |
| LIACOS: | UM, FROM WHAT I WAS TOLD, HE HAD PUSHED, UM…I SHOULD SAY HE PULLED DOWN THE BLANKETS… |
| DONOVAN: | YEAH. |
| LIACOS: | …AND SHE HAD NOTICED THAT HER NIGHTGOWN WAS PUSHED UP . |
| DONOVAN: | RIGHT. |
| LIACOS: | BUT <u>SHE DIDN'T KNOW THAT IT…IF IT HAD BEEN DONE BY HER, I MEAN, UH, BY THE BLANKETS OR HIM.</u> [EMPHASIS ADDED] |

Officer Liacos indicated to me that he included the facts as related in the paragraphs above in his original report and when he was told by Lieutenant Nicastro that additional facts were to be added Officer Liacos did not object because Lieutenant Nicastro had conducted his own interviews at the scene and he may have had information which Officer Liacos did not. That conversation went as follows:

| | |
|---|---|
| DONOVAN: | I'M…YOU KNOW WHAT I MEAN? SO YOUR COMPLAINT OR YOUR, YOUR INFORMATION WAS THAT CONCERNING THAT, THAT THE, THAT…LET ME LOOK AT IT AGAIN. THAT THAT WAS CHANGED? THAT YOU DIDN'T PUT THAT IN YOUR REPORT? |
| LIACOS: | CORRECT. |

DONOVAN:      AND THAT LIEUTENANT NICASTRO CHANGED IT RIGHT IN FRONT OF YOU?

LIACOS:       YUP.

DONOVAN:      DID...WAS THERE ANY DISCUSSION PRIOR TO HIM CHANGING IT, OR HOW DID THAT HAPPEN? IS WHAT...!, I WANT TO HEAR YOUR VERSION, THEN I'M GOING TO SPEAK TO HIM AND, FOR CLARIFICATION, OFFICER.

LIACOS:       MAYBE HE HEARD SOMETHING I DIDN'T.

DONOVAN:      OKAY.

LIACOS:       I MEAN, HE SPOKE TO SOME PEOPLE...

DONOVAN:      NOW, DID HE TELL YOU HE WAS GOING TO CHANGE IT, OR HE JUST CHANGED IT? HE SAID, "I'M CHANGING IT"?

LIACOS:       HE SAID, "I'M JUST GOING TO ADD SOMETHING." AND I SAID, "OKAY."

DONOVAN:      OKAY.

LIACOS:       I'M NOT GOING TO FUSS, YOU KNOW?

DONOVAN:      OKAY. AND, AND, AND THAT'S FAIR. ALL RIGHT. I, I, I HAVE A FEW OTHER QUESTIONS THAT I WANT TO YOU, JUST BECAUSE OF WHAT OFFICER STUART, AND WHAT THE AFFIDAVIT SAYS. WHEN YOU, YOU...DID YOU EVER INTERVIEW THE MOTHER?

LIACOS:       YES.

DONOVAN:      OKAY. WHAT DID SHE TELL YOU HAPPENED, WHEN SH-, WHEN...?

LIACOS:       RIGHT THERE.

DONOVAN:      OKAY.

LIACOS:       ANYTHING THAT'S...EVERYTHING'S WRITTEN THERE, SO, I MEAN...

I spoke with both Kelvin Lopez and Yesenia Lopez at their home on February 1, 2018. I found Kelvin Lopez to have a workable knowledge of English and understood what was being said to him. I also found, however, that he had difficult time speaking in English and often misstated facts and had to clarify himself when asked follow-up questions.

I found that Yesenia Lopez did not have a workable knowledge of English and did not understand much of what I asked her. I also found she had a very difficult time speaking in English and was both confused and troubled when trying to understand my questions and provide answers to them.

I prepared for the interview by obtaining the services of a Brazilian (Portuguese) translator as Lieutenant Nicastro had informed me that the Lopez's were of Brazilian heritage. Upon arrival at their residence, however, I found the Lopez's were Hispanic and that Spanish, not Portuguese, was their primary language. The Lopez's had a friend present for the specific purpose of translating for them to minimize confusion.

I spoke with Yesenia Lopez through the translator and she relayed to me that she had been awoken on the morning of December 2, 2017 by Euner Martin pulling the covers off her and her daughter who were both sleeping in the bed in their bedroom. Euner Martin was pulling the bedcovers down and was physically making a movement as though intending to climb into bed with them. Yesenia physically demonstrated to me how Martin had lifted his foot and placed his hands as if he were going to climb in. Yesenia reported that Martin told her to be quiet and that she called for her husband. She reported that Martin was in his underwear and a t-shirt and had his cellphone in his hand.

It took several attempts by the translator and me to obtain clarification as to whether Yesenia witnessed Martin pull up her daughter's nightgown. The problem in expressing what happened seem to center on the fact that her daughter's night gown was definitely pulled up, but Yesenia Lopez did not actually see Martin pull it up and she did not know if the nightgown was pulled up as a result of her daughter fidgeting during her sleep.

15

Of specific importance is that Yesenia Lopez indicated, through her translator, that she had not told any of the police officers at the scene she witnessed Martin pull up her daughter's nightgown. However, that statement has to be considered in light of the fact that the language barrier is very formidable and, unlike during my interview, there was no translator present on the morning in question.

# V    CONCLUSION

## Conclusion #1 | Insufficient Evidence

I find that there is **INSUFFICIENT EVIDENCE** to prove or disprove the veracity of **Allegation #1**, namely:

> That Lieutenant Jerimiah Nicastro misrepresented the facts that were told to him by Yesenia Lopez with regard to whether Euner Martin lifted the nightgown of Yesenia Lopez's daughter on the morning of December 2, 2018.

Stated plainly: Was the reporting as fact by Lieutenant Nicastro that Euner Martin lifted the nightgown of Yesenia Lopez's daughter a deliberate misrepresentation of the testimony of Mrs. Lopez or was it a legitimate miscommunication resulting from the challenges presented by the English/Spanish language barrier and other factors at the scene?

I have made my finding of insufficient evidence despite the existence of facts which could have led to a contrary result.   I have, notwithstanding, reached this conclusion based upon the following:

- The crime scene on the morning of December 2, 2017 was chaotic and confusing. The apartment at 52 Taylor Street is small and the officers responded to the scene at

3:30 am. In addition, the parties involved in the incident were primarily Spanish speaking with both the defendant and victim having a very limited English vocabulary and understanding of the English language. These facts were exacerbated by the fact that there were no Gloucester Police Officers present who were fluent in Spanish.

- The seriousness of the alleged violation (potential sexual assault) added to the chaos at the scene as the officers indicated they were all very concerned about leaving the alleged perpetrator in the same home with the alleged victims (one of whom was a seven year old girl).

- The language barrier between the Spanish speaking victims, witnesses and the police officers on the scene makes it difficult to prove the discrepancy reported in Mrs. Lopez's statement was intentional. Namely, whether Mrs. Lopez did or did not indicate that Euner Martin lifted the nightgown of the child. The language barrier resulted in several documented miscommunications between the apparent victims and the officers. This is indicative of a legitimate miscommunication between the Lopez's and the Gloucester Police Officers rather than an intentional misrepresentation of the facts concerning the issue of whether or not Martin had lifted the child's nightgown.

- Mrs. Lopez' inability to understand and express herself clearly in English makes it fundamentally impossible to confirm that a miscommunication *did not* occur.

- Officer Liacos also spoke with Yesenia Lopez on December 2, 2017 and left with a different understanding of what Yesenia Lopez told him regarding whether she had witnessed Euner Martin lift her daughter's nightgown. This circumstance is muddled by the fact that Officer Liacos is a reluctant witness and was not in the room when Lieutenant Nicastro spoke to Yesenia Lopez.

- This Investigator believes the factors listed above, taken in the aggregate, fatally limit the probability of successfully pursuing claims against Lieutenant Nicastro for manufacturing evidence/facts in an administrative disciplinary action should one be brought. In sum, it is plausible that Lieutenant Nicastro misunderstood what Mrs.

17

Lopez was saying to him in response to his question as to whether or not she saw Euner Martin lift the child's nightgown.

## Conclusion #2 | Rules Violated

I find, upon witness to all testimony and review of all other relevant evidence in this investigation, that Lieutenant Jeremiah Nicastro violated the Gloucester Police Department Rules and Regulations provided below when he committed the acts comprising Allegation #2, namely:

That Lieutenant Jeremiah Nicastro intentionally manufactured evidence/facts regarding the statement: "Yesenia was awoken unexpectedly to their roommate Euner Martin pulling down the blankets off her daughter and touching her daughters abdomen while pushing up [the daughter's] night gown" which Lieutenant Nicastro admittedly added to Officer Liacos' report after he changed the charges lodged against Euner Martin from Domestic Assault & Battery to the more serious charge of Indecent Assault & Battery. [emphasis added]

Stated plainly: Did Lieutenant Nicastro in his zeal to charge Euner Martin with a heinous crime, fabricate a required element of that crime?

Lieutenant Jeremiah Nicastro violated the Gloucester Police Department Rules and Regulations identified below when he unilaterally upgraded the charges against Euner Martin and added a statement to Officer Liacos' arrest report which was not based on facts obtained through a competent investigative process but rather was based on flawed logic, unsupportable conjecture and incompetence. In support of this finding and conclusion, I present the following compiled evidence and facts:

Yesenia Lopez and her husband Kelvin Lopez were interviewed through a Spanish translator by this Investigator on February 1, 2018, at their residence in Gloucester. Both Yesenia

Lopez and Kelvin Lopez informed me they never told any Gloucester Police Officer that Yesenia Lopez witnessed Euner Martin lift up their daughter's nightgown or touch her abdomen on December 2, 2017.

As noted elsewhere in this report, Lieutenant Nicastro informed me that Yesenia Lopez told him she witnessed Euner Martin lift up her daughter's nightgown. As established with respect to Allegation #1, with some reservation I have concluded it is plausible that Lieutenant Nicastro misunderstood what Mrs. Lopez was telling him for the many reasons listed above (chaotic scene, language barrier, atrocious crime described, etc.). Thus, Mrs. Lopez's testimony to me through an interpreter that she never indicated that Martin lifted her daughter's nightgown is not a surprise. Nor, for reasons set forth immediately below, was it a surprise that Mrs. Lopez denied ever stating that Martin touched her daughter's abdomen.

Lieutenant Nicastro admitted in his interview that he found the requisite element of touching by using the following logic: "*if [Martin] is lifting up the girl's pajamas, he had to have touched her abdomen*" and "*cause it's impossible to take somebody's shirt off without actually touching them*".

The statement Lieutenant Nicastro added to Officer Liacos' report, namely that: "*Yesenia was awoken unexpectedly to their roommate Euner Martin pulling down the blankets off her daughter **and touching her daughters abdomen** while pushing up [the daughter's] night gown*" [emphasis added] appeared as a statement of fact and contained a critical detail necessary to satisfy the requirements of the crime of Indecent Assault & Battery (i.e., touching the child's abdomen). The wording of that statement, as authored by Lieutenant Nicastro, unquestionably leads the reader to conclude that Mrs. Lopez observed the touching firsthand. In reality,

however, as admitted by Lieutenant Nicastro, the element of touching was found only by inference which, as it turns out, was based upon a miscommunication.

Lieutenant Nicastro had no factual basis to support this tenuous inference. The inclusion of this statement as fact in an official police report appears to be an unacceptable embellishment meant only to support a more serious charge against Euner Martin because the conduct alleged to have occurred is universally considered deplorable. As Watch Commander, Lieutenant Nicastro was directly responsible for reviewing, correcting and ensuring that all reports were grammatically correct and otherwise faithful to the facts. He failed at this task.

Lieutenant Nicastro's flawed attempt to upgrade the charges brought against Euner Martin was incompetent and violated the Gloucester Police Department's Code of Ethics, brought discredit to himself and to the Department and negatively impacted the Gloucester Police Department's legitimacy in the eyes of the public. The perversity of an alleged crime cannot be justification for disregarding the most indispensable of all law enforcement canons. Namely, that honesty, integrity and transparency are the fundamental principles upon which law enforcement is built. Even the slightest erosion of those principles irrevocably undermines the public's trust in the police and police officers generally.

To state the obvious, a police officer who embellishes facts and/or evidence regarding an arrest jeopardizes the legality of the arrest and negatively impacts their own credibility and the credibility of fellow officers. In this instance the charges lodged against Euner Martin by the Gloucester Police Department where summarily dismissed after court review of the circumstances surrounding the arrest. Thus, in the form of this summary dismissal, there is a public account of an attempt by the Gloucester Police Department to overreach by tenuously extrapolating facts needed to meet the elemental requirements of a very serious crime.

Accordingly I find, using the preponderance of the evidence standard, that Lieutenant Nicastro violated the following Gloucester Police Department Rules and Regulations:

### GLOUCESTER POLICE DEPARTMENT RULES AND REGULATIONS VIOLATED

**4.0        Law Enforcement Code of Ethics (see attached Appendix A)**

This Rule states, in part:

> "I will keep my private life unsullied as an example to all: maintain courageous calm in the face of danger, scorn, or ridicule, develop self-restraint; and be constantly mindful of the welfare of others.  Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulation of my department."

**6.2.11        Incompetence**

This Rule states:

> "Being incapable of satisfactory performance of police duties which may include a lack of initiative, diligence, sound judgment, ability to take decisive action or any other trait which demonstrates incapacity or ineptness in the performance of assigned task"

**6.7.1        Conduct Unbecoming an Officer**

This Rule states:

> "The commission of any specific act or acts of immoral, improper, disorderly or intemperate personal conduct which reflects discredit upon the officer himself/herself upon his fellow officers or upon the department is prohibited."

21

6.7.17         Obedience to laws

This Rule states:

> "All members shall obey the regulations of the Police Department, the laws of the City of Gloucester, the Commonwealth of Massachusetts, and the United States of America."

Furthermore, in view of the seriousness and ongoing implications of these infractions, it is my recommendation that this investigative report and all relevant material be forwarded to the Essex County District Attorney's Office for review.

Respectfully Submitted by:

*Alfred P. Donovan*

Special Investigator
APD Management Inc.
February 13th ,2018

## LIST OF EXHIBITS

1.    Arrest report of Officer Christopher Liacos for GLO Incident 17GLO-23393-AR

2.    Transcribed Interview of Officer Christopher Liacos Conducted on January 24th, 2018

3.    Transcribed Interview of Lieutenant Jeremiah Nicastro Conducted on January 29th, 2018

4.    Transcribed Interview of Sergeant Ciolino conducted on February 6th, 2018

Gloucester Police Department
Call Number    Printed: 01/17/2018

Page:    1

For Date: 12/02/2017  -  Saturday

Call Number         Time    Call Reason                                    Action                          Duplicate

17-23393            0323    911 - 911 CALL
        Call Taker:         P1052 - Chipperini, Brendan        Arrest(s) Made
        Primary Id:         P1047 - Liacos, Christopher
   Location/Address:        52 TAYLOR ST
     Calling Party:         ***UNKNOWN*** @ ***UNKNOWN***
        CallBack Number: 978-325-7210
                ID:         P1040 - Stuart, Leon
                            Disp-03:25:31
                ID:         P1047 - Liacos, Christopher        Arvd-03:26:18   Clrd-03:59:40
                            Disp-03:25:31
                ID:         P1039 - Ciolino, Jerome             Arvd-03:26:15   Clrd-03:59:42
                            Disp-03:40:56
         Narrative:         12/02/2017 0325 Chipperini, Brendan  Arvd-03:40:59   Clrd-03:58:08
                            Calling party reports unwelcome guest inside his residents
                            and request police. 1687 and 1684 dispatched.

         Narrative:         12/02/2017 0358 Chipperini, Brendan
                            Adult male under arrest.



```
                    Gloucester Police Department                    Page: 1
                         Arrest Report                           01/17/2018

                    Arrest #: 17GLO-23393-AR
                      Call #: 17-23393
```

```
Date/Time Reported: 12/02/2017 @ 0323
  Arrest Date/Time: 12/02/2017 @ 0410
 Booking Date/Time: 12/02/2017 @ 0410
          Involves: Sex Crimes, Juveniles,
                    Domestic Violence
```



```
              OBTN: TGLO201716519
 Reporting Officer: Patrol Officer Christopher Liacos
 Assisting Officer: Patrol Officer Leon Stuart
  Booking Officer: Lieutenant Jeremiah Nicastro
 Approving Officer: Lieutenant Jeremiah Nicastro

         Signature: _____

         Signature: _____
```

| DEFENDANT(S) | | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| MARTIN, EUNER<br>52 TAYLOR ST<br>GLOUCESTER MA 01930 | | M | U | 26 | NOT AVAIL | |

```
litary Active Duty: N
              BODY: NOT AVAIL.            COMPLEXION: NOT AVAIL.
               DOB: 12/18/1990        PLACE OF BIRTH: NOT AVAIL.
    LICENSE NUMBER: NOT AVAIL.             ETHNICITY: HISPANIC
```

```
                      [RIGHTS/BOOKING CHECKS]

    RIGHTS ADVISED BY: Lieutenant Jeremiah T Nicastro    DATE/TIME: 12/02/2017 @ 0411
          PHONE USED: Y       PHONED DATE/TIME: 12/02/2017 @ 0411
    ARRESTEE SECURED: N
```

| OFFENSE(S) | | ATTEMPTED | TYPE |
|---|---|---|---|

```
LOCATION TYPE: Highway/Road/Alley/Street    Zone: Ward 2 Precinct 1
52 TAYLOR ST
GLOUCESTER MA 01930

INDECENT A&B ON CHILD UNDER 14
265/13B/A            265      13B              N           Felony
       OCCURRED: 12/02/2017   0323
  WEAPON/FORCED USED: None
```

| VICTIM(S) | | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| CONFIDENTIAL | | | | | | |

| PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| LOPEZ, KELVIN F<br>52 TAYLOR ST<br>GLOUCESTER MA 01930<br>DOB: 05/26/1988 | PARENT | M | U | 29 | NOT AVAIL | 978-325-7210 |

Gloucester Police Department
Arrest Report

Page: 2
01/17/2018

Arrest #: 17GLO-23393-AR
Call #: 17-23393

| # | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 2 | LOPEZ, YESENIA<br>52 TAYLOR ST<br>GLOUCESTER MA 01930<br>DOB: 10/03/1985 | PARENT | F | U | 32 | NOT AVAIL | 978-325-7210 |

| # | OTHER PROPERTIES | PROPERTY # | STATUS |
|---|---|---|---|
| 1 | ANDROID CELL PHONE<br>QUANTITY: 1<br>SERIAL #: NOT AVAIL<br>DATE: 12/02/2017 | 17GLO-669-PR<br>VALUE: $300.00 | Seized (Not Previously Stolen) |

```
              Gloucester Police Department              Page: 3
                     Arrest Report                      01/17/2018

                  Arrest #: 17GLO-23393-AR
                  Call #: 17-23393


              *******************************
              ***CONFIDENTIAL VICTIM REPORT***
              *******************************
```

| VICTIM(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|
| 1   LOPEZ, ADRIANA | F | P | 7 | NOT AVAIL | |

```
     52 TAYLOR ST
     GLOUCESTER MA 01930
     DOB: 08/24/2010
     INJURIES: None
     ETHNICITY: Hispanic
     RESIDENT STATUS: Unknown
     VICTIM CONNECTED TO OFFENSE NUMBER(S). 1
     RELATION TO: MARTIN EUNER                    Neighbor


 ttachments for 17GLO-23393-AR                              Type
 escription                                                 DOC
 roperty Holding
     Attachment#: 1A95E746B8B244969AF33CBCF860EDOF
```

Gloucester Police Department                          Page: 1
NARRATIVE FOR PATROL OFFICER CHRISTOPHER LIACOS
Ref: 17GLO-23393-AR

Entered: 12/02/2017 @ 0446        Entry ID: P1047
Modified: 12/02/2017 @ 0615      Modified ID: P1014
Approved: 12/31/2017 @ 1638      Approval ID: P1014

I, Officer Liacos report the following summary of events:

On December 2, 2017 at approximately 3:23 a.m. I responded to 52 Taylor Street along with Officer Stuart and Sergeant Ciolino to a report of a past assault. Upon arrival I spoke to Kelvin Lopez who told me that his seven year old daughter Adriana Lopez was asleep with his wife Yesenia Lopez in their bedroom. Yesenia was awoken unexpectedly to their roommate Euner Martin pulling down the blankets off of her daughter and touching her daughters abdomen while pushing up Adriana's night gown. When confronted Martin told Yesenia to "be quiet and don't say anything." Yesenia then screamed at which point her husband Kevlin ran from the living room, where he was asleep to see what was wrong. Martin, who was wearing underwear and a shirt then left the room carrying his cell phone and quickly went into the bathroom. Yesenia then confirmed the story that Kevlin had told me and said that Adriana remained asleep during the incident. I then went and spoke to Euner Martin. Martin only speaks spanish so translation was done through Kevlin. Martin told him that he was sleep walking and did not know why he was in the room. Martin denied making any physical contact with Adriana.

At that time Martin was placed under arrest. He was then escorted to the rear of marked unit 1687 and transported to the police station for booking where he was afforded all of his rights by Lieutenant Nicastro. Martin's cell phone was seized as evidence. A criminal complaint was then filed charging Martin with C265/13b, indecent assault and battery on a child under 14. The department of children and families was also notified.

Respectfully,
Officer Christopher Liacos
Gloucester Police Department

Gloucester Police Department                    Page: 1
SUPPLEMENTAL NARRATIVE FOR DETECTIVE STEVEN MIZZONI
Ref: 17GLO-23393-AR

Entered: 12/04/2017 @ 1334        Entry ID: P1029
Modified: 12/04/2017 @ 1346        Modified ID: P1029
Approved: 12/31/2017 @ 1638        Approval ID: P1014

After further interviews were conducted it was determined that no assault occured. During a probably cause hearing with the clerk magistrate those facts were relayed to her and no probable casue was found. Martin was released forthwith.

The case is still under investigation.