UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LEON STUART, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 18-cv-11877-ADB |
| | * | |
| CITY OF GLOUCESTER and CHIEF JOHN | * | |
| MCCARTHY, in his Individual Capacity, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Leon Stuart ("Plaintiff"), a former City of Gloucester (the "City") police officer and former president of a Gloucester Police Department ("GPD") union, alleges that the City and the GPD's retired police chief John McCarthy ("Chief McCarthy," together with the City, "Defendants") violated his civil rights in contravention of 42 U.S.C. § 1983 and that the City retaliated against him in violation of the Massachusetts Whistleblower Protection Act, Mass. Gen. Laws ch. 149, § 185(b)(1), (3) ("MWPA"). Currently pending before the Court is Defendants' motion for summary judgment. [ECF No. 50]. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

A.      **Factual Background**

Unless otherwise noted, the following facts are undisputed.[1]

1.      Plaintiff's Union Activities

In 2016, Plaintiff became the union president for the Gloucester Police Patrolmen's Association ("GPPA"), which represented a bargaining unit of 45 employees.  [ECF No. 59 ¶ 2]. Prior to becoming the GPPA's president, he had served as a union representative and treasurer. [Id.].

In May 2017, a GPPA member, Detective Tom Quinn, complained to Plaintiff about conduct that occurred at a fellow officer's wake.  [ECF No. 59 ¶¶ 92–93].  According to Detective Quinn, his brother, Lieutenant David Quinn ("Lt. Quinn"), had made an inappropriate comment at the ceremony.  [Id.].  Plaintiff, in his capacity as the GPPA's president, took this complaint to Donna Leete ("Ms. Leete"), the City's Human Resources ("HR") Director, to

---

[1] The Court draws the facts from Defendants' statement of material facts, [ECF No. 52], Plaintiff's response to Defendants' statement of material facts and counterstatement of material facts, [ECF No. 59], and the documents referenced therein.  Defendants ask the Court to: (1) disregard Plaintiff's response to their statement of undisputed material facts, and (2) deem Defendants' statement of facts uncontroverted because Plaintiff's filing does not satisfy Local Rule 56.1's requirements.  [ECF No. 62 at 2–6].  Defendants contend that Plaintiff cites to exhibits that are not in the record to support several of his factual statements.  The Court will not strike Plaintiff's entire statement of facts on these grounds.  Although the Court declines to strike the entire document, the Court will not, and in fact cannot, rely on materials that are not before it. Therefore, to the extent a particular factual statement is unsupported by the evidence in the record, the Court will, unless otherwise noted, disregard that particular statement of fact because it does not comply with Local Rule 56.1.  L.R. 56.1 (stating that "[a] party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation" and that "**[c]opies of all referenced documentation shall be filed as exhibits to the motion or opposition**" (emphasis added)).

discuss his concerns and to ensure appropriate disciplinary action.[2]  [Id. ¶ 116; ECF No. 59-3 at 1].  Plaintiff met with Ms. Leete on May 11, 2017 and, while they were meeting, Plaintiff heard a "radio chirp" outside of the door.  [ECF No. 59 ¶ 94].  Ms. Leete opened the door and reportedly saw Lt. Quinn and another officer, Lieutenant Jeremiah Nicastro ("Lt. Nicastro"), nearby.  [Id.].  An HR Assistant who worked near Ms. Leete's office stated that Lt. Quinn and Lt. Nicastro were not listening to Plaintiff and Ms. Leete's conversation, but Plaintiff still believed that they were.  [Id. ¶¶ 95–97; ECF No. 59-4 at 1].

After the meeting, Plaintiff, through the GPPA's counsel, sent Ms. Leete a letter alleging that Lt. Quinn and Lt. Nicastro had acted improperly and were attempting to intimidate the GPPA's members.  [ECF No. 59 ¶ 97; ECF No. 59-4 (letter)].  This letter was also disseminated to the entire GPPA.  [ECF No. 59 ¶ 98].  After this letter was distributed, Lt. Quinn and Lt. Nicastro complained that Plaintiff had knowingly spread false information about them to the effect that they had been eavesdropping.  [Id. ¶ 99].  On June 29, 2017, Chief McCarthy informed Plaintiff in writing that he was investigating (1) the incident at Ms. Leete's office, and (2) Plaintiff's subsequent conduct, which Chief McCarthy characterized as "dissemination of . . . false accusations to all patrolman in this department . . . ."  [ECF No. 59-5 (notice); ECF No. 59 ¶ 101].  The June 29, 2017 investigation notice contained a list of fourteen questions concerning Plaintiff's conduct following the May 11, 2017 meeting, including his communications with the GPPA's members about the alleged intimidation.  [ECF No. 59-5].  The GPPA challenged Chief McCarthy's investigation by filing a "Charge of Prohibited Practice" with the Massachusetts Department of Labor Relations ("DLR") on July 13, 2017.  See [ECF No. 59-1 at 2 (DLR

---

[2] Lt. Quinn appears to have been a member of a different police union, the Gloucester Superior Officers Association ("GSOA"), and there was concern that members of the GPPA were being mistreated by the GSOA's members.  [ECF No. 59-1 at 3].

opinion)].  On September 28, 2017, Plaintiff also sent a letter to the City's Mayor, Sefatia Romeo Theken ("Mayor Theken"), that notified her about the pending DLR charge and the low morale at the GPD.  [ECF No. 59 ¶ 123; ECF No. 59-6].

2.   <u>November 30, 2017: The Holly Street Incident</u>

On November 30, 2017, Plaintiff was sent to an address on Holly Street in response to a call from a homeowner who wanted an unwelcome male guest to leave.  [ECF No. 59 ¶ 103].  Sergeant Frates, who was Plaintiff's superior, arrived on the scene and told Plaintiff that the guest needed to be arrested, but Plaintiff disagreed with that course of action.  [<u>Id.</u> ¶ 104; ECF No. 52-17 at 2].  The guest was nonetheless ultimately arrested for disorderly conduct.  [ECF No. ¶ 104].  Plaintiff submitted his police report the next day and Lt. Nicastro ordered him to make changes to it.  [<u>Id.</u> ¶ 105].  A draft of the report shows that someone, allegedly Lt. Nicastro, edited the report and asked Plaintiff to add more detail regarding the arrested guest's behavior and encouraged him to charge the guest with disturbing the peace.  [ECF No. 52-15].

On December 7, 2017, Lt. Nicastro issued Plaintiff a letter of insubordination stating that Plaintiff spoke to Sgt. Frates in a "belligerent and demeaning manor" while on the scene at Holly Street.  [ECF No. 59 ¶ 106; ECF No. 52-16 at 2 (letter)].  Plaintiff filed a grievance challenging the insubordination letter on December 11, 2017, and his grievance was denied by Chief McCarthy on December 15, 2017.  [ECF No. 59 ¶¶ 136–37;[3] ECF No. 52-16 at 3 (grievance)].

---

[3] Defendants argue that the portions of the deposition that Plaintiff cites to support this contention were not filed as exhibits with the Court.  [ECF No. 62 at 5].  Plaintiff does, however, transcribe the relevant portion of the deposition directly into his counterstatement of facts and Defendants do not challenge the accuracy of Plaintiff's transcription.  Thus, in its discretion, the Court will rely on the excerpt even though the relevant portion of the transcript was not technically submitted as an exhibit as it should have been.

On December 12, 2017, Plaintiff wrote a memorandum to Chief McCarthy explaining that he had received "improper orders" from Sgt. Frates while at Holly Street, that he "believed that the appropriate action was to get a cab for the unwelcome guest," and that he "did not believe [he] had probable cause to arrest the man, but [he] did not want to disobey a supervisor's order." [ECF No. 52-17 at 2]. Plaintiff also wrote that Lt. Nicastro had ordered him to change the police report to falsely say that the man who was arrested did not allow Plaintiff to complete his interview. [Id.]. Plaintiff made the changes that Lt. Nicastro requested, but he was not comfortable doing so. [Id.].

### 3. December 2, 2017: The Taylor Street Incident

On December 2, 2017, Plaintiff and a fellow officer, Officer Christopher Liacos, responded to a call regarding an alleged assault at an apartment on Taylor Street, where two unrelated families were living together. [ECF No. 59 ¶¶ 108, 138–39]. Lt. Nicastro arrived on the scene shortly after Plaintiff. [ECF No. 59-2 at 4]. The incident involved a mother and her young daughter who had been awakened when their unrelated male roommate pulled their blankets off. [ECF No. 59 ¶ 109]. The daughter's nightgown had been pulled up, but the mother did not see the roommate move the nightgown or touch her daughter. [Id. ¶ 110]. Lt. Nicastro originally said that the roommate should be charged "with a domestic," [id. ¶ 111], but then later ordered that the man be charged with the more serious crime of indecent assault and battery on a child under the age of fourteen, [id. ¶ 141–42]. He also made changes to the police report from the incident. [Id.]. Plaintiff complained about Lt. Nicastro's conduct to Charles Payson ("Mr. Payson"), the City's Attorney, and requested that it be investigated. See [ECF No. 59-7 at 106–108 (Lt. Nicastro's deposition indicating it was his perception that Plaintiff was the "driving force behind" the investigation)]. Plaintiff believed that Lt. Nicastro did not have a basis for his

factual findings or for charging the roommate with the more serious conduct.  At some point in January 2018, Chief McCarthy learned that Plaintiff had complained to Mr. Payson about the Taylor Street incident.[4]  [ECF No. 59 ¶ 145].

In response to Plaintiff's complaint, Mr. Payson, hired a private investigator, Alfred Donovan ("Inspector Donovan"), to investigate the Holly Street and Taylor Street incidents. [ECF No. 59 ¶¶ 112, 147; ECF No. 52-2 at 22–23 (Plaintiff's testimony that Inspector Donovan investigated both incidents); ECF No. 59-2 (investigative report about the Taylor Street incident)].  During the investigation, Officer Liacos told Inspector Donovan that Lt. Nicastro had told him he was going to change the police report for the Taylor Street incident to say that the witness was "awoken unexpectedly to their roommate . . . touching her daughter[']s abdomen while pushing up [the daughter's] nightgown."  [ECF No. 59-2 at 6 (second alteration in original)].  On February 13, 2018, Inspector Donovan released his investigative report, [id. at 22], in which he found that Lt. Nicastro had "no factual basis" to support his edits and that they were added "only to support a more serious charge . . . .", [id. at 20].  He ultimately concluded that Lt. Nicastro committed ethical violations and violated the GPD's rules and regulations with respect to the Taylor Street incident.  [Id. at 21–22].  Lt. Nicastro was never disciplined for anything relating to this incident.  [ECF No. 59-7 at 98].

### 4.    December 28, 2017: Plaintiff's Off-Duty Arrest

On December 28, 2017, Plaintiff was involved in an off-duty arrest of an individual named Shawn Bartholomew ("Mr. Bartholomew").  [ECF No. 59 ¶ 3].  The incident began when

---

[4] Defendants again argue that the portions of the deposition that Plaintiff cites to support this contention are not properly before the Court.  [ECF No. 62 at 5].  As described supra n.3, because Plaintiff transcribed the relevant deposition portion and its accuracy is unchallenged, the Court will rely on the excerpt.

Mr. Bartholomew ran through a stop sign and nearly collided with a minivan driven by Plaintiff's brother, Brad Stuart ("Mr. Stuart").  [Id. ¶¶ 10–14; ECF No. 52-3].  Plaintiff was a passenger in the minivan.  [ECF No. 59 ¶ 14].  After the near collision, Plaintiff and Mr. Stuart decided to turn around and find the driver of the car because they were concerned that he might have been intoxicated, otherwise impaired, or fleeing a crime scene.  [Id. ¶¶ 17–18].  Eventually, Plaintiff and Mr. Stuart located Mr. Bartholomew at a gas station.  [Id. ¶ 18].

Mr. Stuart pulled up behind Mr. Bartholomew at the gas station, exited the minivan, and told Mr. Bartholomew that he had almost killed them.  [ECF No. 59 ¶ 22; ECF No. 52-9 (video of incident)].  Mr. Bartholomew apologized to Mr. Stuart and explained that he was in a rush to get to a meeting.  [ECF No. 59 ¶ 25].  While Mr. Stuart was still out of the minivan, Plaintiff exited the vehicle and said "enough" in order to prevent things from escalating further.[5]  [Id. ¶ 26; ECF No. 52-2 at 35–36].  Plaintiff did not contact the GPD for backup before confronting Mr. Bartholomew.  [ECF No. 59 ¶ 19].  Once out of the minivan, Plaintiff identified himself as an off-duty police officer, ordered Mr. Bartholomew to get back into his vehicle, and told Mr. Bartholomew that he would be calling his license plate number into the police station.  [Id. ¶ 28].

Defendants assert that Mr. Bartholomew asked to see Plaintiff's badge at least twice, but Plaintiff argues that Mr. Bartholomew never made this request and, regardless, GPD policy does not require officers to show a badge or identification.  [ECF No. 59 ¶ 31; ECF No. 52-2 at 53].

---

[5] The parties dispute the exact order of events.  Defendants assert that Mr. Stuart was already walking back to the minivan when Plaintiff exited the vehicle, implying that Plaintiff escalated the situation.  Plaintiff asserts that he heard Mr. Stuart and Mr. Bartholomew "exchanging words," and it was not until Plaintiff said "enough" that Mr. Stuart started walking back.  [ECF No. 59 ¶ 26].

Plaintiff told Mr. Bartholomew to get back into his car a second time.  [ECF No. 59 ¶ 34].

Mr. Bartholomew responded that he was going to pump his gas and then leave.  [Id. ¶ 35].  He

later testified that he would have complied with the request if Plaintiff had shown him a badge.

[Id.].  Plaintiff then told Mr. Bartholomew to stand with his hands against his trunk.  [Id. ¶ 36].

When he did not do so, Plaintiff approached Mr. Bartholomew and put him in a headlock.  [Id.

¶ 39].  Plaintiff was not trained to perform a headlock, [id. ¶ 40], although he maintains that it is

a common technique and appropriate to use when restraining someone, [id.].  While holding

Mr. Bartholomew in a headlock, Plaintiff told a gas station employee to call the police.  [Id.

¶ 43].  Plaintiff also believed that Mr. Bartholomew was trying to reach for a weapon during the

struggle, so he asked Mr. Stuart to grab hold of Mr. Bartholomew's arms until the police cruiser

arrived.  [Id. ¶ 46; ECF No. 52-2 at 60].  The arrest was captured on the gas station's video

surveillance camera, but there is no audio.  [ECF No. 59 ¶¶ 3, 48; ECF No. 52-9 (video of

incident)].

        GPD Officer Alves arrived at the gas station and found Mr. Bartholomew in the

headlock.  [ECF No. 59 ¶ 50].  Plaintiff told Officer Alves to arrest Mr. Bartholomew, and

Officer Alves put him in handcuffs and placed him in the police cruiser.  [Id. ¶¶ 50–51].  After

writing a report and consulting with Plaintiff about its contents, Officer Alves filed a criminal

charge against Mr. Bartholomew for disorderly conduct.  [Id. ¶¶ 55, 58].

                5.    Investigation into the Off-Duty Arrest

        Chief McCarthy first learned about Plaintiff's off-duty arrest on December 29, 2017

when a reporter asked for a copy of the arrest report.  [ECF No. 59 ¶ 59].  Chief McCarthy

testified that he then asked the GPD's operations commander to obtain the surveillance video

from the gas station, but the only video located at that time was taken from an angle that did not capture the arrest.[6]  [ECF No. 52-4 at 15–16].[7]

On or around February 14, 2018, Lt. Quinn approached Chief McCarthy to tell him that he had seen a different video of the off-duty arrest and that it "looked bad."  [ECF No. 52-4 at 15–16].  The District Attorney's office had also seen the second video and warned that Mr. Bartholomew might file a civil rights lawsuit.  [ECF No. 59 ¶ 62].  That same day, Chief McCarthy had the video of the arrest sent to the City's legal department, which in turn hired Inspector Donovan (the same investigator who looked into Lt. Nicastro's actions) to conduct an internal affairs investigation.  [ECF No. 52-4 at 16; ECF No. 59 ¶¶ 63, 171].  On February 21, 2018, Chief McCarthy sent Plaintiff written notice that his actions were being investigated by Inspector Donovan to determine if the arrest violated any of the GPD's policies.  See [ECF No. 59 ¶¶ 64, 170; ECF No. 52-12; ECF No. 59-8].

As part of the investigation, Investigator Donovan reviewed the video and interviewed Plaintiff, Mr. Bartholomew, and Officer Alves.  [ECF No. 59 ¶ 65].  Plaintiff sought to view the video prior to his interview with Inspector Donovan, but he was not provided with a copy.  [ECF No. 52-7 at 8].  Investigator Donovan concluded that Plaintiff had violated the GPD's policies and procedures concerning the use of force, off-duty powers, and reporting on the use of force. [ECF No. 59 ¶ 67].

---

[6] Plaintiff disputes this account but does not cite to anything in the record to indicate that Chief McCarthy viewed the video of the arrest in December 2017.  [ECF No. 59 ¶ 60 (Pl.'s Response)].

[7] The gas station had multiple cameras with different views of the gas pumps. Some of those cameras did not give a clear view of the gas pump where Mr. Bartholomew was arrested.  See [ECF No. 52-9].

6.      Plaintiff's Additional Complaints

Throughout 2018, Plaintiff filed three additional complaints regarding the conduct of his fellow officers and the retaliation he was experiencing.

First, on March 28, 2018, Plaintiff filed a "criminal complaint form" with the Massachusetts Office of the Attorney General ("OAG") that named Inspector Donovan and Lt. Nicastro as the subjects of the complaint.  [ECF No. 59 ¶ 175; ECF No. 59-10 (complaint)].  The complaint alleged that inappropriate conduct occurred during the Holly Street incident and that Inspector Donovan performed an inadequate investigation.  [ECF No. 59-10].

Second, on April 26, 2018, Plaintiff emailed State Police Trooper Baker, who worked in the OAG, and stated that he was being retaliated against for reporting incidents involving other GPD officers.  [ECF No. 59-11 at 1].  He also complained that Inspector Donovan did not conduct thorough investigations and that he "picks and chooses who gets interviewed . . . ." [Id.].

Finally, on May 8, 2018, Plaintiff notified the City, Chief McCarthy, and Mayor Theken that he intended to pursue an action under the MWPA and under state and federal civil rights laws for "retaliation for objecting to and refusing to engage in activities protected by state law and for reporting and/or objecting to matters that he reasonably believed to be violations of law or threats to public safety."  [ECF No. 59-12 at 2].  The notice referenced the Taylor Street and Holly Street incidents.  [Id. at 1–2].

7.    Termination Hearing and Arbitration

On April 11, 2018, Chief McCarthy notified Plaintiff, in writing, that an "Appointing Authority" hearing would take place.[8]  [ECF No. 59 ¶ 68].  That hearing took place on May 15, 2018 before Ms. Leete.  [Id. ¶ 70; ECF No. 52-13 (report from hearing)].  As part of the hearing, Ms. Leete viewed the video from the gas station incident as well as several other exhibits.  [ECF No. 52-13 at 2].  Following the hearing, Ms. Leete issued a report, which explained that she accepted many of Inspector Donovan's findings and recommended that Plaintiff be terminated for violating several of the GPD's policies.  [Id. at 4–5, 7].  Ms. Leete submitted her decision to Mayor Theken, who accepted Ms. Leete's findings.  On June 19, 2018, Mayor Theken sent Plaintiff a termination letter and terminated his employment and benefits.  [ECF No. 59 ¶¶ 72–73; ECF No. 59-15 (letter)].  The next day, Chief McCarthy posted a notice on the "Roll Call Board," which was accessible to all GPD members, that read: "OFFICER LEON STUART'S EMPLOYMENT AS A GLOUCESTER POLICE OFFICER HAS BEEN TERMINATED BY THE CITY OF GLOUCESTER EFFECTIVE JUNE 19, 2018.  ANY POLICE INTERACTION WITH FORMER OFFICER STUART SHOULD BE VETTED THROUGH LIEUTENANT FITZGERALD OR THE CHIEF."  [ECF No. 59-13].  Ms. Stacie Nicastro,[9] the GPD's financial coordinator, testified that around the time of Plaintiff's termination she had a conversation with Chief McCarthy where he said that "it had served [Plaintiff] right for going after two lieutenants."  [ECF No. 59-14 at 31].  Ms. Nicastro further

_____

[8] The parties do not define "appointing authority hearing," but the Court understands it to be a hearing to determine whether Plaintiff's off-duty arrest warranted any punishment.

[9] It is unclear from the record if Ms. Nicastro is related to Lt. Nicastro.

testified that another officer, Lieutenant Gossum, had also heard Chief McCarthy say words to that effect in a different conversation.  [Id. at 32–33].

On June 25, 2018, Plaintiff appealed his termination through the grievance and arbitration process outlined in his collective bargaining agreement.  [ECF No. 59 ¶ 74].  He was represented by the GPPA at the hearing.  See [id. ¶ 75].  The agreed upon issue statement for the arbitration was whether "there [was] just cause for the termination of [Plaintiff]?  If not, what shall be the remedy?"  [ECF No. 52-8 at 2].  Five days of hearings were held in front of arbitrator Michael G. Ryan, Esq.  [ECF No. 59 ¶ 76].[10]  Plaintiff, Mr. Bartholomew, Officer Alves, and others testified at the hearing, and the parties submitted post-hearing briefs.  [Id. ¶ 77].  Plaintiff's testimony and his post-hearing brief discussed the complaints he filed regarding Lt. Nicastro's inappropriate conduct.  [Id. ¶ 79; ECF No. 52-10 at 33–34 (union's post-hearing brief)].  The arbitrator issued an 89-page decision on August 28, 2019, finding that there was just cause to terminate Plaintiff and that Plaintiff's off-duty arrest had violated several GPD policies.  [ECF No. 59 ¶¶ 80–81; ECF No. 52-8].  The arbitrator also found that Plaintiff's "[u]nion and other activities had nothing to do with his termination" and that "[s]uperficially, [the] chronology seems suggestive, but the total picture shows that the coincidence of the [Plaintiff's] activities and the actions against him are just that: coincidence.  There was no causal relationship between the two."  [ECF No. 52-8 at 87].  Plaintiff did not appeal the arbitral decision and award.  [ECF No. 59 ¶ 89].

8.      The DLR's Opinion

On September 5, 2019, after the arbitral decision was issued, the DLR published its decision resolving the complaint that the GPPA had filed back in July 2017.  [ECF No. 59-1].  In

----

[10] The five days of hearing took place on December 6, 2018; January 2, 2019; February 12, 2019; April 17, 2019; and May 13, 2019.  [Id. ¶ 75].

relevant part, the decision found that the list of fourteen union-related questions that Chief

McCarthy sent to Plaintiff was a violation of Massachusetts law, which prohibits coercively

interrogating employees about their union activities.  [Id. at 22–28].  The DLR's decision does

not mention the Holly Street or Taylor Street incidents, which had not yet occurred when the

complaint was submitted.

### B.    Procedural Background

On August 31, 2018, Plaintiff filed his Complaint alleging violations of his constitutional

rights and retaliation.  See [ECF No. 1].  Chief McCarthy filed a motion to dismiss on November

19, 2018, [ECF No. 12], which the Court granted in part and denied in part on July 15, 2019,

[ECF No. 22].[11]  Plaintiff's remaining claims are: (1) violation of his First Amendment rights

under 42 U.S.C. § 1983 against Defendants, (Count I);[12] (2) violation of his Fourteenth

Amendment rights under 42 U.S.C. § 1983 against the City, (Count I);[13] and (3) violation of the

MWPA against the City, (Count II).  See [id. at 27].

---

[11] Lt. Nicastro, who was originally named as a defendant in this action, also filed a motion to dismiss.  [ECF No. 14].  He was dismissed from this case by the Court's July 15, 2019 Order.

[12] All remaining claims against Chief McCarthy are in his individual capacity only.

[13] In its July 15, 2019 Order, the Court only dismissed the Fourteenth Amendment claims against Chief McCarthy because the City had not moved for dismissal at that time.  The City contends, and the Court agrees, that the Fourteenth Amendment analysis in the Court's dismissal order applies equally to the Fourteenth Amendment claims against the City.  Plaintiff does not defend the Fourteenth Amendment claims in his opposition to summary judgment and appears to have abandoned those claims.  See Montany v. Univ. of New Eng., 858 F.3d 34, 41 (1st Cir. 2017) (agreeing that plaintiff's "failure to put forth any argument in [their] opposition to defendants' motion for summary judgment . . . constitutes abandonment of any such claim").  Therefore, the City's motion for summary judgment on Count I is GRANTED to the extent it relates to alleged Fourteenth Amendment violations.

On November 16, 2020, Defendants moved for summary judgment on all remaining claims.  [ECF No. 50].  Plaintiff opposed on December 30, 2020, [ECF No. 57], and Defendants filed their reply on January 27, 2021, [ECF No. 62].

## II.      LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough

competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact."  Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation."  Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## III.    DISCUSSION

### A.    Issue Preclusion

Defendants argue that they are entitled to summary judgment on all claims because the arbitrator has already found that there was "just cause" to terminate Plaintiff, and Plaintiff is therefore collaterally estopped from relitigating any issues relating to his termination.  [ECF No. 51 at 3–5].  Defendants' argument ignores the scope of Plaintiff's claims.  While some of Plaintiff's claims arise from his termination, he has also alleged that he was subject to other adverse actions.  Defendants are therefore incorrect that the arbitral award necessitates summary judgment on all claims.  At most, issue preclusion would apply to the claims that are based on his

termination.  While the record suggests that Plaintiff is, at the very least, estopped from asserting that his termination had no basis in fact, see Seetharaman v. Stone & Webster, Inc., No. 05-cv-11105, 2009 WL 1364706, at *7 (D. Mass. May 11, 2009) ("With regard to plaintiff's termination, the [prior agency] proceedings conclusively established that [defendant] terminated plaintiff for legitimate reasons.  He is therefore precluded from arguing that [defendant's] proffered reason for termination has no basis in fact."), the Court does not need to resolve this issue because Defendants are entitled to summary judgment on the claims arising from Plaintiff's termination regardless of whether issue preclusion applies.  See infra Section III.B, III.C.

> **B.      Count One: Violation of First Amendment Rights, 42 U.S.C. § 1983[14]**

Plaintiff asserts that Defendants violated his First Amendment rights by retaliating against him for speaking out about misconduct and intimidation that he observed at the GPD. [ECF No. 58 at 24–29].

The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. Const. amend. I.  Public employees do not surrender all of their First Amendment rights by virtue of their employment; "[r]ather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). The First Circuit recently explained that to prevail on a speech-retaliation claim, which Plaintiff asserts here,

---

[14] The City argues that it is entitled to summary judgment on the § 1983 claim because there is no basis for municipal liability, and Chief McCarthy asserts that he is entitled to qualified immunity.  [ECF No. 51 at 6–7, 12–14].  Because Count I fails for other reasons, the Court need not address these arguments.

the plaintiff must first show that his or her protected speech related to a matter[ ] of public concern, and was a substantial or motivating factor in the adverse employment consequence.  If the plaintiff meets that test the burden shifts to the defendant to prove by a preponderance of evidence that it would have reached the same decision . . . [regarding the adverse employment event] even in the absence of the protected conduct.   [T]he plaintiff may then discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor.

Stuart v. City of Framingham, 989 F.3d 29, 35 (1st Cir. 2021) (alterations in original) (internal quotation marks and citations omitted).

> 1.     Was the Speech at Issue a Matter of Public Concern?

The public concern inquiry has two parts: "(1) that 'the speech touched upon a matter of public concern' and (2) that [the plaintiff] spoke as a 'citizen' rather than as an employee." McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 170 (D. Mass. 2015) (quoting Decotiis v. Whittemore, 635 F.3d 22, 30 (1st Cir. 2011)), aff'd, 835 F.3d 192 (1st Cir. 2016).

Although no party has comprehensively analyzed each instance of speech at issue, the Court has identified at least nine examples of speech that could form the basis of Plaintiff's First Amendment claim.  They are: (1) the May 11, 2017 meeting with Director Leete; (2) the May 11, 2017 follow-up letter to Director Leete; (3) the July 2017 unfair labor practices complaint filed with the DLR against Chief McCarthy and the City; (4) the September 28, 2017 letter to Mayor Theken; (5) the December 12, 2017 memorandum to Chief McCarthy about Holly Street; (6) the complaint to Mr. Payson about Taylor Street;[15] (7) the March 28, 2018 criminal complaint filed with the OAG; (8) the April 26, 2018 email to the state trooper at the OAG; and (9) the May 8, 2018 letter outlining the forthcoming whistleblower complaint.

---

[15] The exact date of the complaint is unclear, but the record suggests it was between December 2017 and January 2018.

While the Court agrees that much of this speech is likely protected by the First Amendment, because Plaintiff is ultimately unable to demonstrate that his speech was a substantial or motivating factor for any adverse employment action, the Court proceeds straight to the causation prong and declines to undertake an in-depth analysis of the "public concern" prong.

2.      Was the Speech a Substantial and Motivating Reason for the Adverse Action?

Defendants argue that, even if some speech was protected, Plaintiff cannot show the requisite causal connection because his speech was not a "substantial or motivating factor" for his termination.  [ECF No. 51 at 11–12].

The Court first considers whether Defendants' conduct can be considered an "adverse employment action."  An adverse employment action is defined more broadly in the context of § 1983 actions than in the context of employment discrimination cases.  See McGunigle, 132 F. Supp. 3d at 174.  "For purposes of speech retaliation an 'adverse employment consequence' includes an action the employer takes that would 'deter "a reasonably hardy individual[ ]" from exercising his constitutional rights.'"  Gutwill v. City of Framingham, 995 F.3d 6, 12 (1st Cir. 2021) (alteration in original) (quoting Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011)).  "Even 'relatively minor events' can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights."  Barton, 632 F.3d at 29.

The record, examined in the light most favorable to Plaintiff, would allow a factfinder to conclude that two actions taken against Plaintiff could be considered "adverse employment actions" in the § 1983 context.  Although Defendants argue that Plaintiff alleged only his termination as an adverse employment action, this construes the complaint and the briefing too

18

narrowly.  Plaintiff specifically contends that his protected speech was a substantial and motivating factor for: (1) the internal investigation into the off-duty arrest in February 2018, and (2) his termination.  [ECF No. 58 at 27–29].[16]

Plaintiff's termination in June 2018 constitutes an adverse employment action, and Defendants do not appear to contest that point.  The February 2018 internal investigation into Plaintiff's conduct can also qualify as an adverse employment action because even the threat of an investigation by one's employer could deter an ordinary employee from making complaints or otherwise exercising their First Amendment rights.  See Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004) (suggesting that internal investigations are sufficiently adverse actions under § 1983); Gutwill v. City of Framingham, No. 16-cv-12191, 2020 WL 360486, at *9 (D. Mass. Jan. 22, 2020) (finding that a reasonable jury could find that an internal investigation is an adverse employment action because "[a] person is unlikely to risk having his or her conduct scrutinized to an extent that other employees are not subjected to, and if faced with that threat, is instead likely to choose to remain silent"), aff'd, 995 F.3d 6 (1st Cir. 2021).

Having determined that there are two adverse actions that could support his § 1983 claim, the Court next considers whether Plaintiff can satisfy the causation element, which requires him to "show that his . . . protected speech . . . was a substantial or motivating factor in the adverse employment consequence."  Stuart, 989 F.3d at 35 (internal quotation marks and citations omitted).  If Plaintiff "succeeds in establishing [a] causal relationship, the burden of persuasion shifts to the defendants to prove . . . that the adverse employment action would have been taken 'even in the absence of the protected conduct.'"  McGunigle, 835 F.3d at 203 (quoting Guilloty

---

[16]Although Plaintiff raises the June 2017 internal investigation and the insubordination letter as alleged adverse employment actions in support of his MWPA claim, he does not clearly identify them as a basis for his § 1983 claim.

Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003)); see also Rodríguez-García v. Miranda-Marín,

610 F.3d 756, 767 (1st Cir. 2010) ("[E]ven if the defendant's actions were motivated in part by

the plaintiff's protected conduct, the defendant can still prevail if he or she can show that the

protected conduct was not the 'but-for' cause of the adverse action.").  If Defendants meet that

burden, the burden then shifts back to Plaintiff to "discredit the proffered nondiscriminatory

reason, either circumstantially or directly, by adducing evidence that discrimination was more

likely than not a motivating factor."  Stuart, 989 F.3d at 35 (citations omitted).

> a.   February 2018 Internal Investigation

Turning first to the internal investigation, Plaintiff appears to argue that the close

temporal proximity between Chief McCarthy's discovery of Plaintiff's complaints to Mr. Payson

in January 2018; the February 13, 2018 release of Inspector Donovan's report on Lt. Nicastro;

and the initiation of the investigation on February 21, 2018 is sufficient to show causation.  See

[ECF No. 58 at 27 (stating that the "initiation of an investigation [was] on the heels of learning

about multiple complaints of unethical and illegal conduct by his supervisors")].  "Although

close temporal proximity between two events may give rise to an inference of causal connection,

that inference is not necessarily conclusive."  McGunigle, 132 F. Supp. 3d at 174 (internal

quotation marks and citations omitted).

Here, when considering the record as a whole, the temporal proximity between these

three events is insufficient to show that Plaintiff's protected speech was a substantial or

motivating factor for the internal investigation.  First, even though Chief McCarthy sent the

video of the off-duty arrest to the City's legal department, Mr. Payson, on behalf of the City,

made the decision to hire Inspector Donovan.[17]  Thus, any animus that Chief McCarthy may have had is largely irrelevant when an intervening factor, Mr. Payson, caused the investigation.

Second,  Lt. Nicastro was also subject to an internal investigation after his conduct on Taylor Street, which shows that third-party investigations were a tool employed by the City in other circumstances when allegations of misconduct arose and cuts against any claim that Plaintiff was impermissibly targeted because of his protected speech.

Third, the impact of any temporal proximity is also severely diminished when other evidence readily explains why Chief McCarthy brought the issue to Mr. Payson's attention in February 2018.  Chief McCarthy first saw the video, which captures Plaintiff's extremely disturbing conduct and raised concerns that Mr. Bartholomew may file a civil rights lawsuit, in February 2018.  While Plaintiff asserts that Chief McCarthy knew about the incident in December 2017 and his decision to wait can only be explained by animus, Chief McCarthy testified that he saw the video of the arrest for the first time in mid-February 2018.  Plaintiff disputes this timeline and suggests that Chief McCarthy saw the video in December 2017, but he

---

[17] Plaintiff asserts that Chief McCarthy made the decision to initiate the investigation, but he relies only on the notice of investigation to support this claim.  [ECF No. 59 ¶ 170].  Although Chief McCarthy sent Plaintiff the notice, the notice does not say that the investigation was initiated at his behest.  [ECF No. 59-8].  Further, Plaintiff's position on this point is inconsistent because he also acknowledges that it was the City, not Chief McCarthy, that hired Inspector Donovan.  [ECF No. 59 ¶ 171 ("[Inspector] Donovan, the individual who **was hired by the City** to investigate the Plaintiff for this off-duty incident had just previously been hired by the City to do the investigations of Defendants Nicastro and Frates.") (emphasis added)].  Inspector Donovan himself testified at the arbitration that it was Mr. Payson who hired him to conduct the investigation.  [ECF No. 52-3 at 18].  Finally, the arbitrator also determined that it was Mr. Payson who had hired Inspector Donovan after he watched the video.  [ECF No. 52-8 at 40 ("In the meantime, at Chief McCarthy's request, City Attorney Charles Payson reviewed the video in or about mid-February 2018. Payson then arranged for APD Management ("APD") [Inspector Donovan's firm] to perform an internal investigation.")].  Therefore, even viewing the evidence in the light most favorable to Plaintiff, no reasonable jury would find that Chief McCarthy made the decision to hire Inspector Donovan to start the investigation.

has not properly supported his contention, and his dispute therefore amounts to a mere conclusory statement that is insufficient to survive summary judgment.[18]

Finally, although Ms. Nicastro testified that Chief McCarthy made statements after Plaintiff was terminated that suggested he deserved termination for "going after two lieutenants," the probative value of these statements is also nullified because Chief McCarthy did not make the decision to initiate the investigation.

Accordingly, Plaintiff has failed to put forth evidence that would allow a reasonable jury to find that his protected speech was a substantial or motivating reason for the February 2018 internal investigation.  The Court also notes that, given the content of the video, it would have been shocking if there had not been an investigation, irrespective of any speech.

b.   Termination

As to his termination, Plaintiff likewise fails to show that his protected speech was a substantial or motivating factor.  Generously construed, Plaintiff's briefing relies on temporal proximity, disparate treatment, and disparaging remarks to satisfy his burden to show "that discrimination was more likely than not a motivating factor" in his termination.  [ECF No. 58 at 18–24].  Plaintiff relies heavily on Defendants' disparate treatment of Lt. Nicastro to demonstrate that he was terminated in retaliation for his complaints.  [Id. at 23].  Disparate application of discipline can demonstrate that an adverse employment action was motived by retaliation.  See Gutwill, 2020 WL 360486, at *10 (noting that comparators can be used to discredit a defendant's proffered reason for an adverse action).  Although it is undisputed that Lt. Nicastro was never disciplined for his conduct at Taylor Street, this does little to support

---

[18] Plaintiff responded to Defendants' statement of fact on this issue by stating "[d]isputed as to the timeline and chronology of events," without any cites to the record.  [ECF No. 59 ¶ 60].

Plaintiff's claim because Lt. Nicastro is not similarly situated to Plaintiff.  Although both officers were found to have engaged in conduct unbecoming an officer, the nature of the conduct was significantly different.  Plaintiff, unlike Lt. Nicastro, was found to have violated policies relating to the excessive use of force, and his conduct potentially exposed the City to civil liability. Further, Plaintiff's physical assault was caught on video.  Given the differences in the nature of their violative conduct and the far more egregious nature of Plaintiff's behavior, the fact that Lt. Nicastro was not terminated is insufficient to allow a reasonable factfinder to determine that retaliatory animus was more likely than not a motivating factor in the termination.

To the extent Plaintiff relies on them, Chief McCarthy's statements about Plaintiff deserving his termination, without more, are insufficient to show that retaliatory animus was a substantial or motivating factor in the City's termination decision.  This is especially true given the conclusions drawn by others about the nature of the conduct, including by Mayor Theken, who ultimately approved the termination, and the arbitrator, who later determined that the termination was supported by just cause.  Thus, these two remarks by Chief McCarthy do not demonstrate that Plaintiff's speech was a substantial or motivating factor in Mayor Theken's decision to terminate him.

Although Plaintiff complained to the OAG in March 2018—which was close in time to the April 11, 2018 notice of the appointing authority hearing—this temporal proximity alone is insufficient to show causation.  This is particularly true where the date of the notice was within two weeks of when Inspector Donovan's report was published to the City and thus proximate to something other than Plaintiff's complaint.  See McGunigle, 132 F. Supp. 3d at 174 (noting that temporal proximity is not always enough to show causation); [ECF No. 52-8 at 42 (arbitrator's factual finding that report was published on March 31, 2018)].

Even if Plaintiff were able to show causation and shift the burden to the Defendants, they have unquestionably made the requisite showing that they had a legitimate, non-retaliatory reason for firing Plaintiff.  Specifically, Plaintiff was fired due to an off-duty arrest that violated the GPD's policies.  This arrest was captured on video and shown to a third-party investigator, Inspector Donovan, who concluded that Plaintiff's conduct violated excessive force policies. Ms. Leete, while serving as a hearing officer, accepted Inspector Donovan's findings and recommended termination.  The grievant appealed his termination, and an arbitrator conducted his own hearing, analyzed the facts, and independently found that there was clearly just cause to terminate Plaintiff based on the policies he violated.  Thus, Defendants have put forth a legitimate, non-retaliatory reason for the City's ultimate decision to terminate Plaintiff.  And because the Court has already found that the temporal proximity, disparaging remarks, and disparate treatment alleged by Plaintiff are insufficient to satisfy his initial causal burden, they are likewise insufficient to discredit Defendants' legitimate, non-retaliatory reason.

In sum, retaliation for his protected speech was not a substantial or motivating factor for either of Plaintiff's adverse employment actions. Therefore, Defendants' motion for summary judgment on Count I is <u>GRANTED</u>.

### C.     Count Two: Violation of the MWPA

Plaintiff contends that the City violated § 185(b)(1) and (3) of the MWPA when it retaliated against him for speaking out about his superior officers.  [ECF No. 58 at 9–24].

> Section 185(b)(1) [of the MWPA] prohibits a state employer from retaliating against an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law." Mass. Gen. Laws ch. 149, § 185(b)(1). Section 185(b)(3) of the statute prohibits an employer from retaliating against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law." <u>Id.</u> § 185(b)(3).  To qualify for protection under section 185(b)(1), but not under

section 185(b)(3), an employee must first "br[ing] the activity, policy or practice . . . to the attention of a supervisor of the employee by written notice and . . . afford[ ] the employer a reasonable opportunity to correct the activity, policy or practice." Id. § 185(c)(1).

Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014) (alterations and omissions in original).

> The main distinguishing point between [§ 185(b)(1)] and [§ 185(b)(3)] . . . is the employee's level of involvement.  The first category contemplates misconduct, in which the employee may be, but need not be, involved. The third category contemplates misconduct in which the employee is personally involved, or in which the employee is asked to participate.

Cristo v. Worcester Cnty. Sheriff's Off., 156 N.E.3d 225, 231 (Mass. App. Ct. 2020) (citations omitted).

The City first argues that Plaintiff failed to comply with the written disclosure requirements of § 185(b)(1) because he did not disclose the misconduct to a supervisor, but this argument is unavailing.  See [ECF No. 51 at 15].  Regarding the Taylor Street and Holly Street incidents, Plaintiff's protected conduct easily falls under § 185(b)(3) because he was "objecting" to conduct in which he was involved, albeit against his will.  He was asked to change a report he authored and was also on the scene when an individual was being overcharged with a crime. Thus, his complaints about the Holly Street and Taylor Street incidents were not subject to a disclosure requirement.  The only protected activity potentially constrained by § 185(b)(1) was his complaint to Ms. Leete about the intimidation of the GPPA's members.  "The written disclosure requirement . . .  applies only before an employee brings misconduct to the attention of a public body, not before an employee brings misconduct to the attention of a supervisor." Cristo, 156 N.E.3d at 232.  Here, via GPPA's counsel, Plaintiff disclosed what he perceived to be unlawful intimidation to Ms. Leete, the HR director, and not a public body.  The parties do not

address whether Ms. Leete could be considered a "supervisor" under the statute.[19]  Accordingly, based on the relatively undeveloped record on this point, the Court is unable to say with certainty that the written letter to Ms. Leete did not satisfy the disclosure requirement.  The parties may raise this issue again at trial.

Turning to the merits of the MWPA claims, the standard for claims under the MWPA is essentially the same as for claims brought under a First Amendment retaliation theory.  Gutwill, 995 F.3d at 12.  To succeed on his MWPA claim, Plaintiff "must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action."  Pierce, 741 F.3d at 303 (internal quotation marks and citations omitted).  If the Plaintiff makes this showing, the City may still "avoid liability by proffering a legitimate, nonretaliatory reason for the [adverse action]."  Id. (alteration in original) (internal quotation marks and citations omitted).  If the City proffers such a reason, "[t]he burden then shifts back to [Plaintiff] to adduce some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked [the adverse employment action]."  Id. (internal quotation marks and citations omitted).

As the Court understands it, Plaintiff relies on four retaliatory actions to support his MWPA claim: (1) the internal investigation initiated by Chief McCarthy in June 2017 after

---

[19] The MWPA defines "supervisor" as

> any individual to whom an employer has given the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under subsection (g).

Mass. Gen. Laws ch. 149, § 185(a)(4).

Plaintiff complained about the intimidation and harassment of the GPPA's members, [ECF No. 58 at 18]; (2) Chief McCarthy's denial of his grievance regarding Lt. Nicastro's insubordination letter, [id.]; (3) the February 2018 investigation which came on the heels of him formally complaining about Lt. Nicastro's conduct to Mr. Payson, [id. at 18–19]; and (4) his termination, [id. at 22–24].

Under the MWPA, "[r]etaliatory action is defined to include discharge, suspension, demotion, or any other action that adversely affects the terms and conditions of the employment." Bennett v. City of Holyoke, 362 F.3d 1, 5 (1st Cir. 2004). The "terms and conditions" language is not further defined, but at least one Massachusetts appellate court has found similar language in the state's employment discrimination statute to be "pretty open-ended language" that "extended coverage to slights or indignities that might seem evanescent." King v. City of Boston, 883 N.E. 2d 316, 324 (Mass. App. Ct. 2008); see Fox v. Town of Framingham, No. 14-cv-10337, 2016 WL 4771057, at *5 (D. Mass. Sept. 13, 2016) (relying on King when analyzing a retaliatory action under the MWPA).

### 1. June 2017 Investigation

While neither party has identified any case law on point, a reasonable jury could find that, given the "open-ended" nature of "terms and conditions," the June 2017 internal investigation amounted to a retaliatory action. The DLR has already found that Chief McCarthy's actions in June 2017 interfered with Plaintiff's ability to exercise his union rights. [ECF No. 59-1 at 28]. As a unionized employee, it is possible that actions that infringe on Plaintiff's union rights could materially alter the conditions of his employment, and the Court cannot say with certainty that a reasonable jury could not reach that conclusion.

The DLR's conclusions about Chief McCarthy's actions could likewise allow a reasonable jury to find that Plaintiff's participation in protected activity led to the June 2017 internal investigation.  Accordingly, Plaintiff has also satisfied his burden to establish a prima facie case under the MWPA, and the burden now shifts to the City.  Because the City does not address this retaliatory action in its briefing, it has not pointed to any legitimate, nonretaliatory reason for the internal investigation, which occurred prior to his off-duty arrest.  Therefore, at this stage, because he has satisfied his initial burden, Plaintiff's MWPA claim premised on the June 2017 investigation survives summary judgment.

### 2.    Denial of the Insubordination Letter Grievance

In contrast, Chief McCarthy's decision to deny Plaintiff's grievance about Lt. Nicastro's insubordination letter does not rise to the level of a retaliatory action.  Plaintiff does not explain how the act of denying a grievance adversely affected the terms and conditions of his employment, and the Court does not see any evidence in the record to indicate the denial had such an effect.  To the contrary, the letter of insubordination that Plaintiff challenged clearly stated that "[y]ou are not being punished for this incident."  [ECF No. 52-16 at 2].  Thus, any MWPA claim premised on the denial cannot survive summary judgment.

### 3.    February 2018 Internal Investigation and Termination

Without a doubt, a termination is a "retaliatory action" within the meaning of the statute. The Court declines to analyze whether the February 2018 investigation also qualifies as a "retaliatory action," because any claim based on the February 2018 investigation fails for other reasons.  As noted above, the standard for successfully proving a MWPA claim and a First Amendment retaliation claim are essentially the same.  Therefore, the Court's finding that Plaintiff has failed to satisfy the causation element of his § 1983 claims is dispositive with regard

to any MWPA claims based on his termination and the internal investigation into his off-duty arrest.  Therefore, the City is entitled to summary judgment to the extent the MWPA claim arises from the termination or February 2018 internal investigation.

## IV.    CONCLUSION

Accordingly, Defendants' motion for summary judgment, [ECF No. 50], is <u>GRANTED</u> in part and <u>DENIED</u> in part.  Count I is dismissed in its entirety and Count II is dismissed except to the extent that it is premised on the June 2017 internal investigation.

**SO ORDERED.**

September 30, 2021                                    /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE